Honorable Jeffrey A. WAGNER, Petitioner,

v.

MILWAUKEE COUNTY ELECTION COMMISSION,
Respondent,

STATE of Wisconsin, Respondent.

Supreme Court

*No. 02–0375–OA. Oral argument October 9, 2002.—
Decided July 10, 2003.*

2003 WI 103

(Also reported in 666 N.W.2d 816.)

710

For the petitioner there were briefs by *Michael A.I. Whitcomb* and *Michael A.I. Whitcomb S.C.*, Milwaukee, and oral argument by *Michael A. Whitcomb*.

For the respondent, State of Wisconsin, the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

An amicus curiae brief was filed by *Howard B. Eisenberg* and *Joseph D. Kearney,* Milwaukee, on behalf of Janine P. Geske, and there was oral argument by *Joseph D. Kearney.*

¶ 1. JON P. WILCOX, J. On February 7, 2002, the Honorable Jeffrey A. Wagner (Petitioner), a circuit court judge in Milwaukee County, sought leave to commence an original action for declaratory judgment regarding the interpretation of Article VII, Section 10(1) of the Wisconsin Constitution. Although this court initially determined that it was unable to grant the petitioner's request for expedited review, we eventually granted the petitioner leave to commence this original action on March 4, 2002. In this action, we are presented with two related issues. First, we consider whether Article VII, Section 10(1) of the Wisconsin Constitution prohibits a judge or justice of a court of record in this state from holding a nonjudicial position of public trust during the entire period of time for which he was elected and entitled to serve as a judge or justice, even if the person resigns from the judicial position before the term would otherwise expire. Second, if such a prohibition exists, the petitioner asserts that it deprives a resigned judge or justice of liberty and equal protection of the law.

¶ 2. We conclude that Article VII, Section 10(1) is more than a dual office holding provision and does, in fact, prohibit a judge or justice from holding a nonjudicial position of public trust during the entire term for which he or she was originally elected, not simply during the judge or justice's actual time of service in the position. We further find that such a restriction does not violate petitioner's constitutional rights to liberty and equal protection of the law.

714

¶ 3. The facts in this action are not disputed. On March 26, 2002, this court ordered the parties to this matter to submit a Joint Stipulation of Facts, which they did on April 11, 2002. Other important facts emerge from the procedural history of the case. The petitioner is presently serving his third term as a circuit judge for Milwaukee County. His term commenced in August 2000 and expires in August 2006. The petitioner may desire to resign his position as circuit judge and run for the office of County Executive of Milwaukee County and, if elected, hold the office of County Executive of Milwaukee County. Respondent Milwaukee County Election Commission is the agency with whom declarations of candidacy for the position of Milwaukee County Executive must be filed. If it were clear that Article VII, Section 10(1) of the Wisconsin Constitution precluded the petitioner from holding the position of County Executive prior to August 2006, the Milwaukee County Election Commission would refuse to place the petitioner's name on the ballot pursuant to Wis. Stat. § 8.30(1)(c) (1999–2000).[1]

---

[1] Wisconsin Stat. § 8.30(1)(c) (1999–2000) provides:

Candidates ineligible for ballot placement. (1) Except as otherwise provided in this section, the official or agency with whom declarations of candidacy are required to be filed may refuse to place the candidate's name on the ballot:

. . . .

(c) If elected the candidate could not qualify for the office sought within the time allowed by law for qualification because of age, residence, or other impediment.

All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

¶ 4. As noted, the petitioner first sought leave to commence an original action in this court on February 7, 2002. At the time, he expressed specific interest in becoming a candidate in an upcoming election for Milwaukee County Executive. On February 26, 2002, the respondent Milwaukee County Election Commission filed a response indicating that it neither supported nor opposed the petition by Judge Wagner. The deadline for filing nomination papers for the position of Milwaukee County Executive was March 5, 2002. In an order dated February 27, 2002, this court stated that because there was no respondent taking a position adverse to the petitioner, the court would be unable to expeditiously resolve the action before the March 5 deadline. However, the court further ordered that if the petitioner wished to proceed, it would grant the petitioner's request to commence an original action and invite the Office of the Attorney General to serve as the respondent.

¶ 5. On March 1, 2002, the petitioner informed the court that he wished to proceed. By order dated March 4, 2002, this court granted the petitioner leave to commence an original action seeking declaratory relief. It further ordered that the Office of the Attorney General advise the court if it would accept the court's invitation to serve as respondent. The Office of the Attorney General agreed to serve as a respondent in this original action on March 14, 2002. On March 29, 2002, this court granted Professor Janine P. Geske's motion for leave to file a nonparty brief.

II

¶ 6. Before reaching the merits of this dispute, we address the issue of justiciability raised by the amicus

716

in this case. The amicus argues that no justiciable controversy exists in this action and that even if such a controversy does exist, this is an inappropriate case for the court to exercise its jurisdiction. We cannot agree.

¶ 7. Wisconsin Stat. § 806.04, the Uniform Declaratory Judgments Act, provides, in part, that "[c]ourts of record within their respective jurisdictions shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." The statute goes on to enumerate some specific powers conferred to courts, but in Wis. Stat. § 806.04(5), explicitly notes that these enumerations do not limit the general power conferred "in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty." In the present case, a determination by this court will end uncertainty and terminate the controversy that exists regarding the interpretation of this constitutional provision.

¶ 8. This court has stated the requisites for declaratory judgment on previous occasions. In *Loy v. Bunderson,* 107 Wis. 2d 400, 409–10, 320 N.W.2d 175 (1982), this court held that a justiciable controversy must exist in an action for declaratory judgment. The court then went on to state that a justiciable controversy is defined by four factors:

> (1) A controversy in which a claim of right is asserted against one who has an interest in contesting it. (2) The controversy must be between persons whose interests are adverse. (3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest. (4) The issue involved in the controversy must be ripe for judicial determination.

717

*Id.* at 410 (internal quotations omitted); *see also Slawek v. Stroh,* 62 Wis. 2d 295, 306, 215 N.W.2d 9 (1974).

¶ 9. The amicus suggests that this action is moot and the factors above not satisfied because the election in which the petitioner specifically expressed interest has already taken place. We do not find this argument convincing. First, the petitioner and respondents have stipulated that the petitioner maintains an interest in being a candidate for the position of Milwaukee County Executive sometime before his term is due to expire. The State, of course, contends that the Wisconsin Constitution prohibits the petitioner from holding such a position before August 2006. In *Clements v. Fashing,* 457 U.S. 957, 962 (1982), a case similar to the one at hand, the United States Supreme Court held that a Texas Justice of the Peace's claim that a constitutional provision made him ineligible even to become a candidate was sufficient to create a case or controversy and was not merely hypothetical.

¶ 10. Second, we agree with the parties' stipulation that the petitioner has responsibilities to adhere "to his oath as an attorney and a circuit judge to uphold and abide by the laws of the state of Wisconsin." (Joint Stipulation of Facts at 2.) Before running for Milwaukee County Executive, or any other nonjudicial position of public trust, he is right to ascertain what those laws require. It would be bad policy for this court to force a public servant, particularly a judge such as the petitioner here, to risk violating ethical rules and the constitution he has sworn to uphold in order to determine his eligibility to hold a nonjudicial position of public trust. Because the petitioner still has an interest in holding the position of Milwaukee County Executive or another nonjudicial office of public trust before his term expires in 2006, and because he has a present

interest in fulfilling his obligations as an attorney and a circuit judge, we do not find that the case is moot. A decision by the court in this case will affect the decisions regarding candidacy to be made by the petitioner, and the responses by the State and Milwaukee County Election Commission.

¶ 11. Additionally, this court has recognized circumstances where it is appropriate to make a determination in an otherwise moot case. *State ex rel. Angela M.W. v. Kruzicki,* 209 Wis. 2d 112, 120 n.6, 561 N.W.2d 729 (1997). In *Kruzicki,* this court held that exceptions to the mootness rule exist "when the issues presented are of great public importance, or the question is capable and likely of repetition and yet evades appellate review because the appellate process usually cannot be completed in time to have a practical effect on the parties." *Id.* (internal citations omitted). In *In re Guardianship of L.W. v. L.E. Phillips Career Development Center,* 167 Wis. 2d 53, 63, 66–68, 482 N.W.2d 60 (1992),[2] this court used similar standards to get to the merits of a case where the rights of a patient in a persistent vegetative state were at issue, but the patient died of natural causes while the case was pending.

¶ 12. This court granted the petitioner in this case leave to commence an original action, despite its awareness of the fact that the specific election in which

---

[2] *See also State ex rel. La Crosse Tribune v. Cir. Ct. for La Crosse County,* 115 Wis. 2d 220, 228–29, 340 N.W.2d 460 (1983), stating:

> [I]t is hardly in the interest of judicial economy or in the interest of the law-declaring function of this court if matters of serious public concern which are likely to cause judicial disputes in the future are not resolved when a factual basis on which a judicial declaration may be made to guide future conduct is presently before the court.

the petitioner originally expressed interest was over. In our orders regarding acceptance of this case, we have already acknowledged the importance of the issues in this action and the necessity of deciding the issues because of the danger and tendency that this type of case could evade review. *See, e.g., Joyner v. Mofford,* 706 F.2d 1523, 1527 (9th Cir. 1983)(holding, in a challenge to a so-called resign-to-run clause,[3] that such election cases were of the type to evade review).[4]

¶ 13. In our initial denial of the petitioner's request, this court acknowledged that the issue raised is important and "an appropriate subject for the exercise of this court's original jurisdiction." This court also noted: "This petition presents the kind of issue that is capable of repetition, yet evades review." The court went on to state: "For that reason, we are prepared to grant the petition for leave to file an original action."

---

[3] Resign-to-run clauses are today often found in state constitutions. Such a provision requires that an official resign his or her position in order to run for another office. If the person does not voluntarily vacate and runs for office, the former position is automatically deemed vacated. *See, e.g., Ariz. Const., art. XXII, § 18, art. XXII § 28 (2001); Joyner v. Mofford,* 706 F.2d 1523, 1526 (9th Cir. 1983).

[4] The court in *Joyner* stated:

> Election cases like the present one come within the type of controversy that is "capable of repetition, yet evading review." "Evading review" for the purpose of the exception [to mootness] need not mean that review is impossible. It only means that in the ordinary course of affairs it is very likely to escape review. Appellate courts are frequently too slow to process appeals before an election determines the fate of a candidate. If such cases were rendered moot by the occurrence of an election, many constitutionally suspect election laws—including the one under consideration here—could never reach appellate review. *Id.* at 1527 (citing *Rosario v. Rockefeller,* 410 U.S. 752, 756 n.5 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 333 n.2 (1972)).

The facts of this case support such reasoning. Here, the court was unable to decide this case in time to allow the petitioner to meet the filing deadline for nomination papers with respect to the election in which the petitioner expressed particular interest. Such a situation is likely to recur. While the timing of some elections could allow a candidate to bring an action to court for resolution, many will not. Additionally, some situations potentially affected by this provision could arise overnight and require immediate responses. The interpretation of this constitutional provision forces review of the structure and independence of the judiciary—issues that strike at the very heart of our democratic institutions. As shown by the facts of this action, this provision affects the rights and obligations of those who occupy positions in this state's judiciary. The facts of this case are sufficient for this court to make a determination on the merits, and because the issues raised are so important, it is appropriate that this court make such a determination.

■

¶ 14. The same reasoning applies to the argument by amicus that this action is not ripe for resolution. We find that the facts here are sufficient to require a determination by this court. As recently noted by the First Circuit Court of Appeals, in dealing with the issue of ripeness in the situation of a pre-enforcement challenge to a law, "Once the gun has been cocked and aimed and the finger is on the trigger, it is not necessary to wait until the bullet strikes to invoke the Declaratory Judgment Act." *Stern v. United States Dist. Ct. for the District of Massachusetts,* 214 F.3d 4, 10–11 (1st Cir. 2000) (quoting *ANR Pipeline Co. v. Corp. Comm'n,* 860 F.2d 1571, 1578 (10th Cir. 1988)). Here, the petitioner was prepared to become a candidate in an election, but

the wheels of justice could not turn fast enough to make a determination before candidates had to declare themselves for the election.

¶ 15. It is not this court's purpose to disrupt the flow of the elective process, nor is it desirable for this court to force potential candidates into an untenable position in which they must risk violating the very constitution they are entrusted to uphold in order to seek another position from which to serve the public. As such, it is appropriate that we resolve the question as it arises under the facts presented in this case. There is a core institutional interest in protecting the integrity of the judiciary by making a determination in this case. This issue must be resolved so that all those serving as judges and justices of courts of record in this state may know and understand what is required of them under the Wisconsin Constitution.

■

¶ 16. Finally, the amicus asserts that there is a lack of adversity in this case. We do not find that this action is merely an advisory opinion on an academic question upon which the parties have a convenient difference of opinion. As the State noted at oral argument, the Office of the Attorney General represents the interests of the people of the State of Wisconsin. As will be shown, the people have made clear their interpretation and intentions regarding this particular provision of the Wisconsin Constitution. As such, it is the duty of the State's representative in this action to protect the interests of the citizenry. That position is adverse to the position taken by the petitioner, and the State has an interest in preventing the petitioner's claims of a right to resign and hold the position of county executive from becoming the accepted interpretation. It is true that the Milwaukee County Election Commission declined to

take an adverse position in this case, claiming that it did not have the power to do so as a mere ministerial entity. The State, however, through the Office of the Attorney General, is an appropriate respondent in this action.

¶ 17. This court noted in *Loy,* 107 Wis. 2d at 407: "The power of a court to declare rights is broad in scope." Based on the factors discussed above, we find that a justiciable controversy exists in this case and that it is an appropriate case for this court to exercise its original jurisdiction. We therefore move to a determination of the merits of this action.

### III

¶ 18. We have been called upon in this action to interpret the meaning of the phrase "during the term for which elected" as used in Article VII, Section 10(1) of the Wisconsin Constitution. The interpretation of a constitutional provision is subject to de novo review. *State v. City of Oak Creek,* 2000 WI 9, ¶ 18, 232 Wis. 2d 612, 605 N.W.2d 526 (citing *State v. Hansford,* 219 Wis. 2d 226, 234, 580 N.W.2d 171 (1998); *Thompson v. Craney,* 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996)(internal citation omitted)). When determining a constitutional provision's meaning, this court typically examines three sources: "the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption." *Oak Creek,* 232 Wis. 2d 612, ¶ 18.

¶ 19. The petitioner claims that Article VII, Section 10(1) of the Wisconsin Constitution does not prohibit a circuit judge or other judge or justice of a court of record in this state from holding a nonjudicial position of public trust, so long as he or she resigns from the judicial position. The petitioner asserts that this provision merely prohibits dual office holding. However, based on our examination of the relevant sources, we conclude that this provision restricts more than the simultaneous holding of judicial and nonjudicial offices of public trust. This provision prohibits a circuit judge such as the petitioner from holding a nonjudicial office of public trust during the full period of time for which he or she is elected to serve in a judicial position, even if the judge chooses to resign before that term would otherwise expire. Were we to interpret this provision as only a dual office holding restriction, the phrase "during the term for which elected" would be rendered meaningless. The period of time constituting the "term for which elected" as used in Article VII, Section 10 is set when a judge or justice is elected, and is thereafter unalterable by means of resignation.

A. Plain Meaning

¶ 20. We begin with the plain meaning of the words of the Wisconsin Constitution, Article VII, Section 10(1). During the century and a half this provision has existed, numerous sources, including this court, have had the opportunity to interpret the language at issue generally, and the provision at issue specifically. This extensive history guides us to the result we reach today.

¶ 21. The language of the constitutional provision itself lends support to our conclusion that Article VII,

724

Section 10(1) restricts judges and justices from holding nonjudicial offices of public trust "during the term for which elected" regardless of whether or not they resign from judicial office. In its present form, Article VII, Section 10 of the Wisconsin Constitution states:

> **Judges: eligibility to office.** (1) No justice of the supreme court or judge of any court of record shall hold any other office of public trust, except a judicial office, during the term for which elected. . . .

There is a corresponding provision in the Wisconsin Statutes. Wisconsin Stat. § 757.02(2) states: "The judge of any court of record in this state shall be ineligible to hold any office of public trust, except a judicial office, during the term for which he or she was elected or appointed." The development of this statutory provision will be discussed in a later section.

¶ 22.　Article VII, Section 10 was instituted as part of the original constitution adopted by Wisconsin citizens in 1848. At the time of its adoption, Section 10 stated:

> Each of the judges of the supreme and circuit courts shall receive a salary, payable quarterly, of not less than one thousand five hundred dollars annually; they shall receive no fees of office or other compensation than their salaries; *they shall hold no office of public trust, except a judicial office, during the term for which they are respectively elected, and all votes for either of them for any office except a judicial office, given by the legislature or the people, shall be void. . . .*

Wis. Const. art. VII, § 10 (1848)(emphasis added); *see also,* Tenney, H.A., Smith, J.Y., Lambert, David & Tenney, H.W., *Journal of the Convention to Form a Constitution for the State of Wisconsin, With a Sketch of the Debates,* (1848) at 611–12; Milo M. Quaife, *The*

*Attainment of Statehood* 11 (1928) (proclaiming the voters' acceptance of the constitution).

¶ 23. The committee at the first state constitutional convention in 1846 initially reported Article VII, Section 10, in relevant part, as follows:

> [T]hey shall hold no other office or public trust, and all votes for either of them for any office except that of judge of the supreme or circuit court given by the legislature or the people shall be void. If any judge shall resign his office he shall not be eligible or appointed to any office within one year after such resignation. . . .

Milo M. Quaife, *The Convention of 1846* 293 (1919).

¶ 24. The convention adopted a modified version of that provision in the 1846 constitution. That version of Article VII, Section 10 stated:

> Sec. 10. Each of the judges of the supreme and circuit courts shall . . . hold no other office of public trust, and all votes for either of them for any office except that of judge of the supreme or circuit court, given by the legislature or the people, shall be void. If any judge shall resign his office, he shall not be eligible or appointed to any office within two years after such resignation. . . .

Tenney, *Journal of the Convention to Form a Constitution* (1848) at 637. One significant change between these two drafts is the increase from one to two years of the restriction on judges and justices following resignation from office. Both versions of Section 10 illustrate a desire by the drafters to restrict judges even after resignation. This first attempt at a constitution for Wisconsin was rejected by the people. Milo M. Quaife, *The Struggle Over Ratification, 1846–1847* 697 (1920) (reprinting the governor's 1847 proclamation that the 1846 constitution was not adopted).

726

¶ 25. The dissent intimates that because the first attempt at ratification failed, the discussion from those debates on the subject of an elected judiciary is largely unpersuasive. Dissent, ¶¶ 89–90, 97. We vehemently disagree. As noted by one scholar:

> Although the constitution framed by this [the 1846] convention was rejected by the people, extended discussion of its proceedings is appropriate. In essential details the 1848 constitution followed closely the rejected predecessor. Also the framing of the 1846 constitution brought more sharply into focus the vital political, economic and social issues of the period than did its successor. After the 1846 convention, that of 1848, in matter of public interest, was largely an anticlimax.

Ray A. Brown, *The Making of the Wisconsin Constitution,* 1949 Wis. L. Rev. 648, 655 n.* (hereinafter *Part I*). We believe the debate surrounding elected judges and the best method of achieving an independent judiciary was one that began in 1846 and continued its evolution through the second constitutional convention.[5]

¶ 26. Whether judges should be appointed or elected was one of the issues extensively debated during the 1846 constitutional convention. Quaife, *The Convention of 1846* at 287–88. Mr. Charles M. Baker, the reporter of the committee on the organization and functions of the judiciary, spoke upon the matter when the article on the judiciary was reported to the convention:

---

[5] As one authority noted: "The debate on the judiciary article was largely an echo of that in the 1846 convention on the same article with the result that in essential respects the article in the 1848 document was the same as that in the earlier constitution." Ray A. Brown, *The Making of the Wisconsin Constitution,* 1952 Wis. L. Rev. 23, 36.

But there is one feature in the judicial system proposed for adoption by a majority of the committee so prominent and important and upon which so decided a difference of opinion exists that it demands a more minute and extended examination. It is the election of the judges by the people. This principle lies at the foundation of the whole superstructure, and it is of the first importance to ascertain whether it is sound and correct. It is conceded by all that government naturally resolves itself into the three branches, executive, legislative, and judicial, and that their appropriate spheres of action are so diverse that there is both a propriety and a necessity for keeping each not only distinct from but so far as possible entirely independent of the other. It is also an axiom of government in this country that the people are the source of all political power, and to them should their officers and rulers be responsible for the faithful discharge of their respective duties. . . . The judicial power, a distinct and coequal department, which should be wholly independent of the others, instead of emanating from the people, the true source of all political power, has been dependent for existence upon the executive or legislative will, or perhaps both. The necessary result, in a measure, must be the dependence of the judiciary upon one or both of the other branches of government and its independence of the people. . . .

*Id.* From this it is clear that the committee was intensely concerned about creating and supporting a truly independent judiciary and proposed that an elective judiciary would be better fit for such purpose. Mr. Baker went on to discuss objections to the elected judges:

Another objection to the elective mode is that the judges may be induced to render unjust decisions in order to secure a reelection. This supposes the preexistence of a weak and corrupt judge, that the parties

interested are of opposite politics, or that one has very considerable and the other very little political influence, and that a decision is to be made not long before an election. . . . Nothing in this country would sooner seal the political doom of any judge, by all parties and every honest man, than the attempt to bend his decisions from the line of justice to make political capital. . . . He alone can be a popular judge who is honest, impartial, decided, and fearless; who holds with a steady hand the scales of justice, and will suffer no improper influences to approach them; whose judgment, though it may somewhat waiver and tremble in doubt, ultimately points steadily to the pole of eternal truth and justice. . . .

*See id.* at 290. *See also* Quaife, *The Convention of 1846* at 587–603 (reprinting additional portions of the debate on the judiciary).

¶ 27. Mr. Edward G. Ryan[6] brought a different perspective to the convention when he spoke of the proposed elective judiciary. Mr. Ryan was initially a member of the judiciary committee,[7] but asked to be excused from the committee after a heated debate over an increase of the number of people on the committee. *See id.* at 62. Nevertheless, Mr. Ryan was a prominent

---

[6] Edward G. Ryan served as Chief Justice of the Wisconsin Supreme Court from 1874–1880. Wisconsin Legislative Reference Bureau, *State of Wisconsin Blue Book* 714 (2001–2002). He was appointed by Governor William Taylor in June 1874 to fill the seat left absent when Justice Luther S. Dixon resigned. Alfons J. Beitzinger, *Edward G. Ryan, Lion of the Law,* 106–10 (1960). He subsequently retained the position in the 1875 election, and continued serving as Chief Justice until his death in 1880. *Id.* at 121, 148, 169. At least one historian has credited Ryan with being the "father" of the judicial disqualification provision. *Id.* at 176–77 n.13.

[7] *See* Milo M. Quaife, *The Convention of 1846* 58 (1919).

figure in the convention as a whole, and a vocal participant in the debates over the structure of the judiciary. *See* Brown, *Part I,* at 666–69 (noting Ryan as one of the members of the convention that "deserve[s] particular mention" and discussing Ryan's views in the discussion of the judiciary article).[8] Mr. Ryan thought there were problems with both systems, elective or appointed.[9] *See*

[8] An examination of the debates at the first constitutional convention makes it apparent that Mr. Ryan was a major figure in the debates on the judiciary. *See, e.g.,* Quaife, *The Convention of 1846* at 590–603. As will be seen in our discussion, it is clear Mr. Ryan disagreed with elements of the draft provision created by the committee, but it is also clear that Mr. Ryan had significant influence during the debates.

[9] The dissent takes issue with our discussion of Mr. Ryan's point of view. The dissent states: "[The majority] fails to note . . . that Ryan's proposal was for a judiciary appointed by the governor." Dissent, ¶ 91 n.1. The dissent also goes so far as to suggest: "Perhaps [the majority] does not realize that these statements [from the first constitutional convention] were made in a speech promoting the merits of an appointed judiciary, a position which was defeated in both constitutional conventions." Dissent, ¶ 92. The majority is well aware of Ryan's doubts about an elected judiciary. However, we note again that Ryan had qualms about both systems and during the first convention, he put forth proposals that he felt would work best. A description of the convention proceedings on November 30, 1846, validates this:

> Mr. Ryan said that he had not voted for the amendment for simple appointment; he could not do it; he knew too well all the evils of the old system. He was opposed to election; he was also opposed to simple appointment on the old plan. Much reflection on the difficulties of both plans had led his mind to the principles embodied in his present proposition. This proposition avoiding altogether the difficulties of election seemed to him to avoid also all the objections of weight to the system of appointment.

Quaife, *The Convention of 1846* at 590–91.

730

Quaife, *The Convention of 1846* at 587. He recommended several changes to the reported proposal. *Id.* at 587–88. Among other recommendations, Mr. Ryan specifically moved for the proposed articles to be returned to the committee for consideration of several matters, including his recommendation that "[n]o judge [would] be eligible to any office, except judicial, for the term for which he is appointed judge." *Id.* at 589. Although the motion to recommit the article was subsequently rejected, there is uncanny similarity between the language proposed by Mr. Ryan and the language that eventually found its way into the constitution ratified by the people. Even in the 1846 draft put before the people, a provision specifically restricted judges from holding other office after resignation.

¶ 28. On November 30, 1846, Mr. Ryan spoke again about the method for selecting the judiciary. He again emphasized several principles, including that a judge should not be eligible to other nonjudicial offices for "the full term of his appointment." *Id.* at 591. He emphasized the importance of an independent judiciary, which he thought impossible if the judges were too often subject to election by the people. He stated:

> Sir, in this system it is not the people I distrust, but the judges to be chosen by the people; it is not the choice of the people so much, as the effect of the choice upon the judges. This objection combines with it the

---

The dissent seems to suggest that the majority's interpretation rises or falls upon whether those that supported the type of phrase at issue here were in favor of or against an elected judiciary. Dissent, ¶¶ 90–92. Our whole point, however, is that the constitutional debates led to a compromised solution with which proponents of both systems could live, provided sufficient safeguards such as the section in issue here.

short terms of election. And this, sir, is my grand distrust of the elective system.

. . . Elected by the suffrages of the people, for a short term, with the hope of reelection or promotion, the political officer looks back forever upon his constituents, is inquisitive of the popular sentiment, full of anxious regard for the popular will, feels the public pulse and counts his own healthy when it beats responsively to that. In political office, this is right, this is admirable. It is the vitality of the representative system that the representative should thus forever look back from his own judgment to the will of his people, and thus anxiously ascertaining should faithfully execute the delegated will of those who chose him for his power and inclination to obey them. But that which is the vitality of political representation will be the corruption of the judiciary. . . . Man on the bench and man in political office are the same in nature, subject, if exposed, to the same influences . . . . Elect the judges by the people, for short terms, with the hope of reelection or promotion—sir, the judge will cease to be the representative of truth and right and justice alone; he will be the representative of the people and will represent the popular judgment, when there is one, not his own. He, too, will remember who elected him and who must reelect him; . . . and, sitting on the seat of justice, her representative, he will look forth to mark the blowing of the popular breeze and will steer the course of public justice by the popular current . . . .

. . . .

I do not say that there will be no exceptions to this influence; I do not say that the choice of the people will never fall upon a man of a high strength of character and stern integrity of mind, above and beyond all such influence. . . . But I say that this is the tendency of the system, the inevitable tendency . . . .

732

*Id.* at 597–99. These statements show a distrust of the elective system, particularly with short terms for such judges.[10] Although Mr. Ryan failed in his attempts to recommit the proposal, he did have supporters, and the product, Article VII, Section 10, that emerged from the 1846 convention appears, in all respects, to be a compromise of the two more extreme views expressed above. The 1846 constitution provided that judges were to be elected, but it also placed limitations upon those serving to isolate them from the sway of popular politics.

¶ 29. As noted, the constitution that emerged from the first convention was rejected. However, a second constitutional convention met and the constitution adopted at this convention was ratified by the people in 1848. During the second convention, on December 24, 1847, the Committee on the Judiciary reported to the convention a new version of Article VII, Section 10, stating, in relevant part:

> They shall hold no other office of public trust, and all votes for either of them for any office, except that of judge of the supreme or circuit court, given by the legislature or the people shall be void.

Tenney, *Journal of the Convention to Form a Constitution* (1848) at 67. Only one amendment had explanation:

---

[10] The divide over the method of selecting judges was reflected not only in the debates of the first convention, but also in public opinion of the time. As one author noted: "Those who favored the elected judiciary were in the majority, though many supported the time honored practice of appointment. *All, however, recognized the need for a strong and independent judiciary.*" Ray A. Brown, *The Making of the Wisconsin Constitution,* 1949 Wis. L. Rev. 648, 656 (emphasis added.)

733

> Mr. KILBOURN moved so to amend that the disqualification of a judge from being elected to any other office, should not apply to a judicial office. His object was to leave the restriction so that a judge of the district court might be elected a judge of the supreme court.

> The amendment was adopted.

*Id.* at 422. However, the final draft of the constitution that was adopted by the convention and eventually ratified by the citizenry included yet another variation in the text of Article VII, Section 10, adding the phrase now at the center of our discussion:

> [T]hey shall hold no office of public trust, except a judicial office, *during the term for which they are respectively elected,* and all votes for either of them for any office except a judicial office, given by the legislature or the people, shall be void. . . .

*Id.* at 611–12. During this second convention, the debates fell once again upon the subject of term length for judges. *See* Quaife, *The Attainment of Statehood* at 634–37, 692–97 (reprinting convention debates on the subject of the length of judicial terms of office). On January 19, 1848, Mr. Chase, a delegate to the second convention, offered an amendment to reduce the term of office of the judges from ten to five years. *See id.* at 634. Many other delegates then offered statements on pros and cons of this amendment. Mr. Chase asserted: "Ten years seemed to place the judiciary practically beyond the power of the people; and some gentlemen even advocated so long a term for that very purpose." *Id.* at 635. Mr. Dunn, on the other hand, suggested long terms might be better:

> The doctrine of short terms and low salaries was a favorite one with many, and in general he believed in it.

734

> Yet in the case of judges there was not the same necessity for a frequent recurrence to the people as in the case of political officers. . . . To secure good judges it was necessary to offer sufficient inducements for men of the highest order of talent to devote their lives to that study. . . . Another reason for long terms was that too frequent elections would place before judges temptations to swerve from duty and to seek popularity as a means of reelection, in ways which were unbecoming to the dignity of their station. A judge, after giving up his other pursuits in life, and in a measure unfitting himself for them, would very naturally desire a reelection as a means of subsistence.

*Id.* Again, quite a split in opinion emerged. While no explanation of the particular amendment adding the "during the term for which elected" phrase appears in the written accounts of the convention,[11] we believe the concerns raised at the conventions and the various drafts of the constitution can lead to only one logical conclusion. All of the drafts from the 1846 convention contained a provision prohibiting judges from holding a nonjudicial office of public trust for a period of time even after resignation. The second draft lengthened the period of prohibition. The first draft from the second convention contained no such provision, but the language was significantly revised into the version that went before the people. The latter, the draft that became part of our original constitution, again contained a description of the period of prohibition. The drafters of the constitution voiced concerns over the evils of an elected judiciary and long debated over the appropriate term lengths for various judges. Given the nature of the debates and the text itself of early

---

[11] The fact of the amendment, at least, was noted. *See* Milo M. Quaife, *The Attainment of Statehood* 696 (1928).

versions of the constitution, it is clear to us that the drafters considered various periods of restriction and eventually settled on "during the term for which they are respectively elected." The very fact that such restrictions were written into the constitutional drafts indicates a compromise between those favoring an elected judiciary and those leery of the elective system. The judiciary was to be elected, but strict restrictions were put into place to preserve its independence. While today such a provision might not seem the best option to some, at the time and for the 150–plus years since its creation, this provision has effectively served to preserve the independence and integrity of this state's judiciary.

¶ 30. Article VII, Section 10 has been amended only twice. The first amendment, adopted in 1912, dealt with the salary of judges and had no relation to the eligibility prohibition at issue here.[12] *See* 1909 Joint Resolution 34; ch. 665, Laws of 1911; 1911 Joint Resolution 24.

¶ 31. In 1977, as part of a broader court reform that included the creation of the court of appeals, the text of Article VII, Section 10 was again modified. This amendment split Section 10 into two subsections and

---

[12] The section, as then amended, read:

Section 10. Each of the judges of the supreme and circuit courts shall receive a salary, payable * * * *at such time as the legislature shall fix,* of not less than one thousand five hundred dollars annually . . . they shall hold no office of public trust, except a judicial office, during the term for which they are respectively elected, and all votes for either of them for any office, except a judicial office, given by the legislature or the people, shall be void.

Wis. Const., art. VII, § 10 (1912) (emphasis added to amended text).

Section 10(1), the provision now at issue, emerged in the form it retains today, stating, in relevant part:

> Section 10. (1) No justice of the supreme court or judge of any court of record shall hold any other office of public trust, except a judicial office, during the term for which elected. . . .

Wis. Const. art. VII, § 10(1) (1977). *See also* 1975 Enrolled Joint Resolution 13; 1977 Enrolled Joint Resolution 7.

¶ 32. In 1995, Wisconsin voters were presented with another opportunity to amend Article VII, Section 10; however, this time they declined to do so. In April 1995, Wisconsin voters rejected a referendum under which the phrase "during the term for which elected" would have been eliminated from Section 10(1). *See* 1995 Assembly Joint Resolution 15. Because the referendum failed, though, the phrase "during the term for which elected" remains part of the constitution.

¶ 33. This phrase has survived all the various changes to this section of the constitution. As the 1995 proposed amendment makes clear, had the drafters intended only a prohibition of simultaneous office holding, this phrase would be unnecessary and, in fact, stand in the way of such interpretation. Our constitution was adopted directly by the people and for that reason its words should be construed in the manner most consistent with common understanding. *State ex rel. Martin v. Heil,* 242 Wis. 41, 55, 7 N.W.2d 375 (1942); *Payne v. Racine,* 217 Wis. 550, 555, 259 N.W. 437 (1935). Keeping this in mind, it is logical that were this phrase not in Article VII, Section 10, the restriction would seem to apply to those who held the stated offices and only while they held those offices. If one resigns from

737

the bench, the entitlement to the office is surrendered. Why is the phrase included, if not to define the period of prohibition? The drafters clearly could have created only a dual office holding prohibition, had they so intended. They did so elsewhere in the constitution. For example, they plainly created such a provision in Article IV, Section 13:

> No person being a member of congress, or holding any military or civil office under the United States shall be eligible to a seat in the legislature; and if any person shall, after his election as a member of the legislature, be elected to congress, or be appointed to any office, civil, or military, under the government of the United States, his acceptance thereof shall vacate his seat.

Wis. Const. art. IV, § 13 (1848). Another example is found in Article XIII, Section 3:

> No member of congress, nor any person holding any office of profit or trust under the United States, (post-masters excepted), or under any foreign power . . . shall be eligible to any office of trust, profit, or honor in this state.

Wis. Const. art. XIII, § 3 (1848). As this court has noted before, terms in statutes or, in this case, constitutional provisions, should be construed to give effect "to each and every word, clause and sentence" and "a construction that would result in any portion of a statute being superfluous should be avoided wherever possible." *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980). The petitioner's interpretation of Article VII, Section 10(1), suggesting that "the term" ends when a judge or justice resigns, would render the phrase "during the term for which elected" meaningless.

As suggested by the State, this interpretation "ignores the language it is supposed to be interpreting." (Resp't Br. at 12.)

¶ 34. Additionally, such an interpretation conflicts with a literal interpretation of the words used in the provision. The constitution provides specific terms of service for those on the bench. Article VII, Section 7 proclaims, in pertinent part: "Circuit judges shall be elected for 6–year terms." Since 1977, when the court of appeals was created, a parallel provision has existed for court of appeals' judges in Article VII, Section 5(2). Finally, Article VII, Section 4(1) states that justices of the state supreme court "shall be elected for 10–year terms of office."[13] Such clear language cannot be ignored. The constitution sets the length of the prohibition to be "during the term for which elected" and the "term for which elected" has been defined in the text of the constitution. Thus, we must agree with the State's argument that although one's "term" may refer to the time a particular person serves, the "term for which elected" as used here appears to be fixed by the constitutional language.

¶ 35. The legislative history surrounding the 1977 amendment and the proposed 1995 amendment to Article VII, Section 10 further support our interpretation. The history of the 1977 amendment to Section 10 is somewhat murky, most likely because the changes to Section 10 were only a small part of an extensive

---

[13] The same was true when the constitution was adopted in 1848. Although the length of terms has varied, even in 1848, judges and justices were elected to serve for a set term of years. *See* Wis. Const. art. VII, §§ 4, 7; Tenney, H.A., Smith, J.Y., Lambert, David & Tenney, H.W., *Journal of the Convention to Form a Constitution for the State of Wisconsin, With a Sketch of the Debates* (1848) at 610–11.

739

■■■■■■

■■■■■■

overhaul of the Wisconsin court system. One need only glance at the related legislation to realize the scope of the changes suggested. *See* 1977 Enrolled Joint Resolution 7. The language of the pertinent question placed on the 1977 ballot illustrates the point. It stated, in relevant part: "[S]hall section 21 of article I, sections 17 and 26 of article IV, and sections 2 to 4, 6 to 10 and 14 of article VII of the constitution be amended . . . ?" 1977 Enrolled Joint Resolution 7. Since the goal was overall reform of the state court system, it is not too surprising that the language of Section 10 did not receive much individual attention, at least in the written commentary on the reforms. That noted, however, the legislative history regarding the 1977 amendment does, indirectly, reveal some clues. The 1977 Senate Joint Resolution 9 included a short analysis by the Legislative Reference Bureau regarding the changes to Article VII, Section 10, which stated, in relevant part:

> *Deleted are existing provisions* which now guarantee judges an annual salary of not less than $1,500, which now require justices and judges to be at least 25 years old, and *which declare void any votes cast for the holder of a judicial office who, during his term of office, seeks election to a nonjudicial office.*

1977 Senate Joint Resolution 9 (emphasis added). There is nothing in the analysis to suggest the deletion would affect the interpretation of "during the term for which elected."

¶ 36. As required under Wisconsin law, the Attorney General authored an Explanatory Statement regarding the proposed amendment.[14] *See* Wisconsin

---

[14] Wisconsin Stat. § 10.01(2)(c) (1977) provided that public notice must be given for referendum issues. The statute at the time provided, in part:

Briefs, *Constitutional Amendments to be Considered by the Wisconsin Electorate April 5, 1977,* LRB-77–WB-1 (March 1977). Regarding the referendum question that included the changes to Article VII, Section 10, the Attorney General wrote:

> If you answer 'Yes' to the above-stated question, you will be voting (a) to create certain new features in the Wisconsin Constitution; (b) to repeal certain other features of it; and (c) in a few instances, to recreate one of the repealed features by inserting it elsewhere in such Constitution.

*Id.* at 7. The Attorney General then detailed the changes. *Id.* Among the "new features" would be an "amendment of [the] prohibition against supreme court justices or circuit judges holding any other office of public trust, except judicial office, during the term for which elected, to make it applicable to such justices and judges of any court of record instead of to such justices and circuit judges." *Id.* The Attorney General then went on to explain that a "yes" vote would be a vote "to repeal, that is, to eliminate," certain features of the constitution, including: "[the] provision that votes for supreme court justice or circuit court judge, for office he is ineligible to hold, given by the Legislature or the people, shall be void." *Id.* at 8. These are the only statements

Type C—The type C notice shall be given whenever referenda questions are submitted to a vote of the people. The notice shall contain the entire text of the referenda questions and an explanatory statement of the effect of either a "yes" or "no" vote. For state questions, the statement shall be prepared by the attorney general. . . .

Although the language of this provision has been modified since 1977, the requirement that the Attorney General provide an explanatory statement for state referendum questions has remained. *See* Wis. Stat. § 10.01(2)(c).

related to the Section 10 eligibility clause. These analyses show that the reform not only left the prohibition intact, but in fact, expanded the number of jurists covered by the prohibition. The analyses also suggest that the other changes to the section were intended to eliminate obsolete language from the text of the constitution.

¶ 37. The legislative history surrounding the 1995 proposed amendment is more clear. The petitioner argues that the purpose of the 1995 proposed amendment was to clear up an ambiguity. However, the legislative history of this amendment belies such an interpretation. The amendment survived first consideration by the 1993 legislature and arose for second consideration and presentation to the voters in 1995. *See* 1993 Assembly Joint Resolution 81, *Analysis by the Legislative Reference Bureau.* In the 1993 legislation, the Legislative Reference Bureau included the following explanation of the proposal:

> Unlike any other elective office, the state constitution prohibits any justice of the supreme court or judge of any court of record, "during the term for which elected," from holding any other office of public trust.

> This constitutional amendment, proposed to the 1993 legislature on "first consideration", eliminated that restriction. With the restriction gone, a judge, like any other elected or appointed officer, could be elected or appointed to a different office of public trust if the judge resigns the judgeship before assuming the different office.

*Id.* Similarly, when taken up on second consideration in 1995, the Legislative Reference Bureau noted:

> The state constitution prohibits any justice of the supreme court or judge of any court of record from

holding any other office of public trust, except a judicial office, during the term for which elected.

This constitutional amendment permits a justice or judge to be elected or appointed to a different office of public trust if the justice or judge vacates the judicial office before assuming the different office.

1995 Assembly Joint Resolution 15, *Analysis by the Legislative Reference Bureau.* There can be no doubt as to the position of the Legislative Reference Bureau. In discussing this and other proposed changes to the constitution in Wisconsin Briefs, the Bureau titled its section on the proposed amendment to Section 10, "Removing Restriction on Judges Holding Nonjudicial Public Office after Resignation During the Judicial Term." Wisconsin Briefs, *Constitutional Amendments to be Considered by the Wisconsin Voters April 4, 1995,* LRB-95–WB-6 (March 1995).

¶ 38. In 1992, in response to questions raised by Representative Scott Jensen, the Wisconsin Legislative Council staff issued the following analysis of Section 10:

Based on the language of the holding-other-office prohibition and the interpretation of that language, it appears that a judge *may not* hold any other state office of public trust during his or her term, *even if* the judge resigns his or her judicial office.

It is significant that the Wisconsin Constitution, Wisconsin Statutes and Supreme Court Rules refer to the period "during the term for which elected," "during the term for which he or she was elected or appointed" and "during the term for which he or she is elected or appointed," respectively. Had the intent of the prohibition been merely to prevent the simultaneous holding of another office of public trust by a judge, there would have been no need to refer to the period during the judge's term.

Wisconsin Legislative Council Staff Memorandum, *Eligibility of Judge to Hold Other Office of Public Trust During Term,* June 30, 1992, at 2 (hereinafter 1992 Eligibility Memorandum).

¶ 39. According to the 1992 Eligibility Memorandum, the Director of State Courts at the time apparently read the prohibition to allow the holding of another office of public trust if the judge or justice resigned from judicial office because successors elected to fill vacancies are elected for an entire term. *Id.* at 3. The petitioner now asserts the same argument based on the vacancy-filling provisions of Article VII, Section 9 and Wis. Stat. § 8.50(4)(f)4.[15] However, as the 1992 Eligibility Memorandum noted:

> It is difficult: (1) to understand the significance of the election to a full term by a successor filling a judicial vacancy, particularly in light of constitutional and statutory references to specific judicial terms (10 years for Supreme Court Justices, six years for Court of Appeals and Circuit Court Judges); and (2) to reconcile the Director's position with the language of the holding-other-office prohibition.

*Id.*

¶ 40. In his explanatory statement regarding the 1995 proposed amendment, the Attorney General appears to have concurred with the analysis of the Bureau:

---

[15] Notably, if one looks back at the original constitution, when Sections 9 and 10 of Article VII were created, the slant of Section 9 is different. Originally, Section 9 provided that once a successor was elected to fill a vacancy in a judicial office, that successor "shall hold his office the residue of the unexpired term." Wis. Const., art. VII, § 9 (1848).

Article VII, section 10(1) of the Wisconsin Constitution presently prohibits any justice of the supreme court or any judge of a court of record from holding any other office of public trust, except a judicial office, during the term for which the justice or judge was elected. A "yes" vote on this constitutional amendment would allow a justice or judge to be elected or appointed to a different office of public trust if the justice or judge vacated the judicial office before assuming the different office. A "no" vote would retain the present language of section 10(1) of article VII of the Wisconsin Constitution and would continue the prohibition against a justice or judge holding any other office of public trust, except a judicial office, during the term for which the justice or judge was elected.

Wisconsin Briefs, LRB-95–WB-6 (March 1995). It cannot be explained much more clearly. Moreover, the referendum question posed to the people of Wisconsin was stated as follows:

Eligibility of judges for nonjudicial office. Shall section 10(1) of article VII of the constitution be amended to permit a judge to assume a nonjudicial office of public trust after vacating the judicial office during that term of office?

1995 Assembly Joint Resolution 15; Elections Board, *Record of Rejected Referenda* (May 3, 1995). That terminology suggests that the amendment would allow activity that was previously prohibited. If the purpose was only to clarify an ambiguity, the referendum question could have easily stated that purpose. With the explanation by the Attorney General and the referendum question itself at their disposal, the people of Wisconsin rejected the amendment to Section 10. Thus, as recently as 1995, the people of the state have made clear that they intend for the prohibition of Section 10

745

to extend even beyond resignation. While we are aware that voter intent is not always clearly discerned, this court has recognized its value to interpretation of the law. As we noted in *Ekern v. Zimmerman,* 187 Wis. 180, 193–94, 204 N.W. 803 (1925): "The people voted intelligently upon this proposition, which clearly evidences their intention, and, where such intention appears, the construction and interpretation of the acts must follow accordingly."

¶ 41. The textual evidence and legislative history thus appear to us to support the State's position. We next turn to this court's precedents. Fortunately, we do not begin in a vacuum, because this court has previously interpreted this very provision. In 1909, this court was asked to interpret the language of Article IV, Section 26 of the Wisconsin Constitution. *See State ex rel. Bashford v. Frear,* 138 Wis. 536, 538, 120 N.W. 216 (1909). In so doing, this court compared the use of the word "term" in Article IV, Section 26 to its use in Article VII of the Wisconsin Constitution and concluded they were intended to have different meanings, stating:

> So the conclusion is that *the judicial term mentioned in art. VII of the constitution has regard, primarily, to the office, disassociated from the occupant of it;* in other words, it contemplates unity, so that several incumbents during the term take mere parts of its entirety; that "his term of office," as used in sec. 26, art. IV, of the constitution, has regard, primarily, to the personal element, the incumbent of the office; contemplates the period of incumbency, whether of a whole term, or a part of the entirety, under art. VII. . . .

*Bashford,* 138 Wis. at 556 (emphasis added). The court took particular notice of Article VII, Section 10. After repeating the text of the section prohibiting holding of a nonjudicial office of public trust "during the term for

which he is elected," the court found: "Here we have the office, the term of office, the incident of office, to wit, the salary and the exclusion from every field of official life outside of the judicial field during such term, to wit, the elective term." *Id.* at 541–42.

¶ 42. Also important is this court's analysis in *Bashford* of Article VII, Section 9. The court found that Section 9 further supported the interpretation that use of the word "term" in Article VII meant the full elected term, because Section 9 operated to recognize "the unity of the term." *Id.* at 543. At the time of the case, under Section 9, if a vacancy existed on the supreme court, the governor appointed someone to fill the vacancy until a successor was elected and qualified. *See id.* As previously noted, the newly elected successor would then hold the office for "the residue of the unexpired term." *Id.* Thus, at least in 1909, the period constituting the full elected term had significance in the operation of the courts. In sum, the court found that "from first to last" the word "term" in Article VII dealt with the entire elected term. *Id.*

¶ 43. During the 1940s, this court twice revisited the language of Article VII, Section 10. Both cases, *Wettengel v. Zimmerman,* 249 Wis. 237, 24 N.W.2d 504 (1946) and *State v. McCarthy,* 255 Wis. 234, 38 N.W.2d 679 (1949), involved the election of Wisconsin circuit court judge Joseph R. McCarthy to a seat in the United States Senate. In *Wettengel,* 249 Wis. at 239–40, the petitioners sought to keep McCarthy's name off of the ballot, arguing that under Section 10, McCarthy, as a circuit court judge, was prohibited from holding an office such as that of United States Senator until his term expired in January 1952. Additionally, they argued that under the same provision, all votes cast for him were null and void. *Id.* at 240. This court, however, held

747

that it had no jurisdiction to grant the petition sought, because the election was for federal office and controlled by the United States Constitution and solely within the realm of authority of the United States Senate. *Id.* at 247–48.

■

¶ 44. In 1949, we again dealt with Article VII, Section 10 when the Board of State Bar Commissioners filed a petition in the Wisconsin Supreme Court requesting that McCarthy be disciplined because he ran for office and was elected as a United States Senator without resigning and surrendering his office as a circuit judge. *McCarthy,* 255 Wis. at 238. In that case, we held that McCarthy violated the constitution and laws of the State of Wisconsin by conduct in "clear disregard of the provisions of sec. 10, art. VII, Const., and sec. 256.02(2) Stats." *Id.* at 242. We explicitly described the fault with McCarthy's actions:

> In this case the defendant was not only a candidate for the office of United States senator but was a holder of that office during the term for which he was elected circuit judge, although he was not a holder of the office of circuit judge and United States senator contemporaneously.

*Id.* at 243. That is exactly the same problem that would arise in this case were the petitioner to resign from the bench and run for Milwaukee County Executive before August 2006. The court in *McCarthy* further explained the issue:

> While a circuit judge may become a candidate under the laws of the United States for the office of United States senator at an election held and supervised under state law, he nevertheless does so in defiance of the laws of the state, which are not effective to

748

prevent his candidacy, but his conduct is nevertheless a clear violation of provisions of the constitution and the statute. . . .

We again call attention to the fact that the constitution, sec. 10, art. VII, provides that a circuit judge shall hold no office of public trust except a judicial office *"during the term for which they are respectively elected."*

. . . .

Under the facts of this case we can reach no other conclusion than that the defendant by accepting and holding the office of United States senator during the term for which he was elected circuit judge did so in violation of the terms of the constitution and laws of the state of Wisconsin, and in so doing violated his oath as a circuit judge and as an attorney at law.

*Id.* (emphasis in original). The petitioner asserts that this court's language was dicta and should not now bind us. We disagree, because this court explicitly took up the question, discussed it, and answered it. Under such circumstances, this court should be bound by our previous interpretation. *See State v. Rodriguez,* 221 Wis. 2d 487, 496–97, 585 N.W.2d 701 (Ct. App. 1998). The dissent goes a step further, suggesting that this court misinterpreted and "mistakenly attributed" its interpretation to its prior ruling. Dissent, ¶ 117. We also disagree with this assertion. The key passages of analysis, discussed above, do not rely upon the previous ruling in *Wettengel.* The only citation to *Wettengel* during the relevant analysis is for the statement that "those who opposed the candidacy of the defendant did not give full weight to the fact that citizens of this country are subject to two governments." *McCarthy,* 255 Wis. at 242. Moreover, in *McCarthy,* this court did have cause to raise the overall interpretation of Article

749

VII, Section 10, and do an analysis previously undone, because the question of whether McCarthy could run for federal office had already been answered and the court was left with the more invidious question of a moral and professional wrong, which required a close examination of the scope of the relevant provision. Hence, we believe this court has already examined this provision and held, in strong terms, that the prohibition exists even beyond resignation. This previous interpretation should not be ignored.

¶ 45. Interestingly, we noted in *McCarthy*, 255 Wis. at 248, that at least three circuit judges became candidates for federal office while serving as judges. After an extensive discussion of the oaths taken by such officials and their meaning, this court took a step back. In concluding that the petition should be dismissed, this court found that the behavior, while wrong, was not likely to be repeated. *Id.* at 250. The court also held that the legislature's way of dealing with this type of constitutional breach was to leave it "to the condemnation of the electorate." *Id.* at 251. Candidates in the past may have been in a position to take their chances with the electorate. Like the *McCarthy* court, we do not dispute that such examples exist. The parties in *McCarthy* brought a variety of examples before the court, all, as far as we can discern, involving federal office. *See id.* at 244–45. Some involved federal judges or judges of other states. *Id.* at 245. We do not find the candidacies of the past to be persuasive regarding the correct interpretation of this provision. As we noted in *McCarthy:* "The conduct of other persons under the same or similar circumstances may have some bearing upon the question of the moral quality of the defendant's behavior but are not relevant on the question of the legal consequences of defendant's conduct." *Id.*

¶ 46. On November 14, 1967, a formal *Code of Judicial Ethics* was adopted by the Wisconsin Supreme Court. *See Code of Judicial Ethics,* 36 Wis. 2d 252, 155 N.W.2d 565 (1967). These rules have been modified over the years and are now embodied in the Code of Judicial Conduct, SCR Chapter 60.[16] *See* SCR Chapter 60 (2002). Until 1997, when the Code of Judicial Conduct came into effect, two provisions in the rules dealt with a judge's obligations regarding nonjudicial offices of public trust. *See* SCR 60.04; SCR 60.05 (1996). Prior to the change, SCR 60.04 paralleled Section 10 of the constitution and its statutory corollary, stating: "A judge shall not hold any office of public trust except a judicial office during the term for which he or she is elected or appointed." SCR 60.04 (1996). The current Code does not contain such a provision. *See* Code of Judicial Conduct, SCR Chapter 60 (2002). Supreme Court Rule 60.05, the other related provision, remains in the Code, embodied in SCR 60.06. It states: "A judge shall not become a candidate for a federal, state or local nonjudicial elective office without first resigning his or her judgeship." The Comment following SCR 60.06(1) provides, in pertinent part: "This provision derives from former SCR 60.05, which was considered necessary because of the possibility that a candidacy for an office to take effect after the expiration of the judicial term would not be barred by former SCR 60.04." The 1992 Legislative Council's Staff Memorandum discussing the proposed amendment to Section 10 found that these ethical rules confirm the interpretation that the Section 10 restriction is unaffected by resignation:

---

[16] Effective January 1, 1997, the Code of Judicial Ethics was replaced with the Code of Judicial Conduct, SCR Chapter 60.

> The comment to SCR 60.05 appears to assume that a federal, state or local nonjudicial elective office, which ordinarily would be an office of public trust, is barred by SCR 60.04 (and, therefore, also by the applicable constitutional and statutory provisions) during the term for which a judge is elected or appointed, *even if* the judge resigns the judicial office.

1992 Eligibility Memorandum, at 3 (emphasis in original).

¶ 47. This court examined these particular ethical rules on at least two occasions. *See In re Judicial Disciplinary Proceedings Against Stern,* 224 Wis. 2d 220, 589 N.W.2d 407 (1999); *In re Complaint Against Pressentin,* 139 Wis. 2d 150, 406 N.W.2d 779 (1987). However, both of the cases are distinguishable from the situation at hand and are, therefore, of limited use in our analysis. In *Pressentin,* 139 Wis. 2d at 151–53, this court found that a municipal judge violated the then existing Code of Judicial Ethics by running for nonjudicial elective office, county supervisor, without resigning from the municipal judge position. Judge Pressentin lost the election in which he ran for a nonjudicial office of public trust, so the only provision at issue in the case was SCR 60.05 (now SCR 60.06), the Supreme Court Rule against *running* for office while a sitting judge. *See id.*

¶ 48. In *Stern,* 224 Wis. 2d at 221–22, this court found that a municipal judge violated the former provision of the Code of Judicial Ethics 60.04 by holding two offices of public trust—municipal judge and school board member. This court found that, unlike the related constitutional and statutory provisions, the Supreme Court Rule did apply to municipal judges. *Id.* at 224–25. Thus, this court found that Judge Stern violated only SCR 60.04. *Id.* Because the only conduct at issue in

*Stern* was simultaneous office holding, this court had no reason to speculate about the type of situation that now faces this court. Also, Judge Stern did not resign from his judicial position, but ultimately decided to resign from the school board, his nonjudicial position of public trust. *Id.* at 226.

¶ 49. Now that we have examined the interpretation of the specific provision, we next take a step back to take a more general look at interpretation of the phrase. The Attorney General of this state has been asked to interpret the phrase "the term for which elected" on several occasions, not only in the context of constitutional amendments, but in other contexts as well. Consistently, the Attorney General has found that the phrase means the entire time for which a person is elected, not just the time served. For example, in 1908, the Attorney General found that a county board member was ineligible to serve as the county supervisor of assessments, because under sec. 2, ch. 523, Laws of 1925, "[n]o member of the county board shall be eligible to the office of supervisor of assessments during the term for which he was elected or chosen member of such board," and the member's term on the county board did not expire until after he would take office for the other position. Op. Att'y Gen. 763–64 (1908). The Attorney General noted: "[The board member] was not capable of being chosen to the said office during the term for which he had been elected. His resignation would not alter the case." *Id.* at 764.

¶ 50. Similarly, in 1912, the Attorney General responded to a question regarding the appointment of a city alderman to the position of marshal by the mayor. *See* Op. Att'y Gen. 785 (1912). At the time, § 925–249 of the Wisconsin Statutes stated: "No member of the common council shall, during the term for which he is

753

elected, be eligible to any other municipal office, except the office of mayor, existing at the time of his election or created by the council subsequent thereto." *Id.* The Attorney General went on to discuss the interpretation of the phrase "term for which he is elected," stating:

> The term for which a person is elected does not expire when he resigns. It refers to the time for which he was elected, and he is not eligible under a provision such as this until the full time has expired, whether he resigns the position then held by him or not.

*Id.*[17] Thus, it appears that this court, the Office of the Attorney General, the legislature, and the people of this state have all agreed that "during the term for which elected" as used in Article VII, Section 10 amounts to more than a prohibition of simultaneous office holding.

¶ 51. This court's interpretation of Section 10 stands firm in comparison to the interpretation of similar language by courts in other states. Other states have found this type of language in constitutional provisions to be unambiguous. For instance, in 1895, the Minnesota Supreme Court interpreted the phrase "during the time for which he is elected" in the context

---

[17] *See also* V Op. Att'y Gen. 762 (1916); II Op. Att'y Gen. 775 (1913)(stating that the term for which elected does not expire with resignation); II Op. Att'y Gen. 756 (1913)(explaining again that " '[t]he term for which a person is elected does not expire when he resigns' " (internal citations omitted) and that, as such, a county board member would not be eligible to be county superintendent of the poor, even if he resigned prior to being appointed superintendent); Op. Att'y Gen. 769–70 (1912)("The fact that Mr. Hudson resigned his office does not terminate the term for which he was elected."); Op. Att'y Gen. 773–74 (1912) ("The fact that Mr. Hudson resigned his office and did not serve out his full term does not change the fact that he was elected for the term of one year.").

of a restriction upon legislators. *State ex rel. Childs v. Sutton,* 65 N.W. 262, 263 (Minn. 1895). At the time, Article IV, Section 9 of the Minnesota Constitution stated: "No senator or representative shall, *during the time for which he is elected,* hold any office under the authority of the United States or the state of Minnesota, except that of postmaster."[18] *Id.* (emphasis added). In interpreting this provision, that court stated:

> [I]t is not necessary for us to speculate upon the intention of the framers of the constitution in adopting the provision in question. A bare reading of this provision suffices to enable us to ascertain and understand its meaning, and we need not search for light through the uncertainties of extraneous interpretation or construction . . . . The respondent, Sutton, became a representative of the legislature of the state of Minnesota on the first Monday in January, 1895, and the time for which he was elected continues until the first Monday in January, 1897. *He was not merely prohibited from*

---

[18] In ¶ 119–122, the dissent attempts to negate our comparison of this section to the Wisconsin provision. However, in its attempts to do so, we believe the dissent is comparing apples to oranges. The dissent cites a different constitutional provision, Article VI, Section 11 of the Minnesota Constitution, which does not contain a phrase comparable to the "during the term for which elected" in the Wisconsin Constitution. The dissent also cites the case of *Dougherty v. Holm,* 44 N.W.2d 83 (Minn. 1950) as support. Again, because this case references Article VI, Section 11, for its analysis, rather than Article IV, Section 9, which has the provision similar to Wisconsin's, it is simply not relevant. *Id.* at 86. The dissent appears to miss the point of our comparison. We compare Article VII, Section 10 of the Wisconsin Constitution and Article IV, Section 9 of the Minnesota Constitution because the operative language contained therein is similar. The focus of the comparison is on the specific language used in the provisions which restricts eligibility for officeholding, not for whom the language applies.

*holding any office during the time for which he might serve, but during the time for which he was elected. The difference is obvious, and the language too sweeping to be disregarded. The respondent could not nullify the constitutional prohibitory clause, "during the time for which he was elected," by his resignation of the office of representative. The time for which he was elected was the entire constitutional term of two years, and, whether he resigned during that time or not, he was not permitted to hold any other office, under the authority of this state, during such entire term.*

*Id.* at 263 (emphasis added). The court explained further and noted the prohibition also applied to the judiciary.

There can be no serious question raised as to the right of a member of the legislature to resign his office; but, if he does so, it cannot enlarge his right to hold another office, in violation of this constitutional prohibition. The disability only ceases at the expiration of the full period of time for which he was elected. This prohibition against holding other offices also applies to the judiciary.

*Id.* at 263–64; *see also Miller v. Holm,* 14 N.W.2d 99 (Minn. 1944) (reaffirming the *Childs* interpretation). Other states in various contexts have found similarly. *See, e.g., Wilson v. Shaw,* 188 N.W. 940, 942 (Iowa 1922) ("The term lives on even though the incumbent resigns, is impeached, or dies."); *Baskin v. State,* 232 P. 388 (Okla. 1925).

¶ 52. As seen in *Childs,* the context in which the interpretation has sometimes arisen is not with judges, but with other elected officials. Many states, including Wisconsin, have language somewhat similar to Article

VII, Section 10 in provisions dealing with legislators. For example, Article IV, Section 12 of the Wisconsin Constitution states:

> No member of the legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected.

¶ 53. This provision has been examined by this court. However, the context of this provision and others like it, make comparisons to Article VII, Section 10 difficult. This court held in *State ex rel. Johnson v. Nye*, 148 Wis. 659, 668, 135 N.W. 126, (1912), that "[t]he constitutional provision under consideration should be narrowly construed in favor of eligibility." That case, like many others, raised a question concerning the clauses regarding creation of an office, or whether "emoluments" were increased during the term for which elected. *Id.* at 669. These types of cases are not helpful, because the subsequent phraseology of the provision affects the interpretation of the phrase itself. Only where the analysis focuses strictly on the phrase "term for which elected" can we compare these provisions. *See, e.g., Chenowith v. Chambers,* 164 P. 428, 430 (Cal. Dist. Ct. App. 1917).

¶ 54. In addition, although many states have interpreted language similar to that of Article VII, Section 10 somewhere along the line, many such provisions, if they existed, have now been weeded out in favor of resign-to-run type clauses. *See, e.g.,* Minn. Const., art. VI, § 6 (2002); Haw. Const., art. II, § 7 (1993 & Supp. 2001); Ariz. Const., art. VI, § 28 (2001), Alaska Const., art. IV, § 14 (2002). The effort of tracing the evolution of these clauses in other states is not war-

ranted, because, as we have discussed, our state has its own constitutional history that developed the provision we today examine.

¶ 55. From the review of the emergence of our own constitutional language and the various examinations of that language by other authorities alone, we are persuaded that the "term for which elected" is not effectively terminated by resignation, at least in this constitutional context. Our review of the other sources required by our constitutional analysis further supports this conclusion.

B. Constitutional Debates and Practices in Existence at the Time of the Writing of the Constitution

¶ 56. Having examined in depth the plain meaning of Section 10 in context, we now turn to the second part of our analysis, a discussion of the constitutional debates. In the context of the plain meaning analysis, we have examined much of the debate by the original drafters that resulted in the creation of Section 10. The constitutional debates do not, of themselves, provide an answer to the question posed by this case. Since even the most comprehensive accounts of the debates are incomplete, we are left to interpret what we have. However, the debates do provide significant clues regarding the concerns of those involved in drafting the constitution, and early versions of the provision at issue created during the process support the State's interpretation. As described in Part A, the debates focused on whether the judiciary should be elected and appointed and, after election was selected as the proper method, the debate shifted to the appropriate length for a judge or justice's term.

¶ 57. We reiterate here that the concerns about judicial independence raised at these early debates and

the textual evolution of Section 10 during the drafting process lead us to the conclusion that the text of Section 10 was a compromise of two extreme views. The numerous drafts of Section 10 noted in Part A show a consistent effort to restrict judges even for a period after resignation. Thus, the debates support our conclusion that the phrase "during the term for which elected" means the *entire* period for which elected, not simply the time a judge or justice chooses to serve. Those advocating an elected judiciary were successful in creating a constitution providing for elected judges. However, those skeptical of the elective system also "won" to some degree in that they were able to have limitations placed upon that elected judiciary to distance the judiciary from the political landscape.

¶ 58. As we have noted, the dissent suggests that review of the 1846 constitution is unhelpful to interpreting the constitutional language adopted in 1848. The dissent states that the discussion is irrelevant "because it cites debates focusing on the wrong issue, from the wrong constitutional convention, to interpret a phrase that was not adopted at that convention, by delegates who were not elected to the subsequent and more relevant 1848 convention." Dissent, ¶ 89. We could not disagree more. The drafting of the Wisconsin Constitution was a process begun in 1846. The delegates to the convention in 1848 did not start from scratch and, in fact, intended mainly to address the specific issues that led to the first draft's failure. As noted in one analysis:

> As previously pointed out the main outlines of the 1846 constitution were satisfactory. Its rejection was due to the controversial articles therein on banks and paper money, homestead exemptions, and the grant of separate property rights to married women. In the 1848

convention constant reference was made to the 1846 constitution and to the approval or disapproval by the people of specific articles therein. When the two constitutions are laid side by side it will be found that many provisions in the two instruments are identical.

Ray A. Brown, *The Making of the Wisconsin Constitution,* 1952 Wis. L. Rev. 23, 23 n.1 (hereinafter *Part II*).

¶ 59. The dissent suggests that the debate over election of judges was over by 1848, so the 1846 debates focusing on that point do not matter. Dissent, ¶ 90. We believe those discussions mattered a great deal and the issues discussed there began a debate that continued all the way through the second convention. In fact, "[t]he debate on the judiciary article was largely an echo of that in the 1846 convention on the same article with the result that in essential respects the article in the 1848 document was the same as that in the earlier constitution." Brown, *Part II,* at 36.

¶ 60. We agree that by the time of the second convention, it was clear that judges were to be elected. Dissent, ¶ 90. However, that does not mean everyone at the second convention readily acquiesced to the idea of an elected judiciary and certainly, the debates make clear that the delegates passionately disagreed about how to best implement such an elective system. As Brown states:

Although individual members of the 1848 convention expressed doubts of the elective principle as applied to judges, it was recognized that the popular will demanded election and no serious argument against it was made. The contentions pro and contra in the 1846 convention on the election of judges were, however, used in the 1848 convention on the question of the proper terms for supreme court and circuit court judges.

Brown, *Part II,* at 37. Other debated issues concerning the judiciary included whether or not a separate supreme court should be established, whether a tax should be levied on all civil suits, and whether membership in the bar was a prerequisite to practice in Wisconsin courts. Brown, *Part II,* at 36–37, 40–41.

¶ 61. The debates are our best information about the practices at the time the constitution was adopted. As shown through the discussions included in Part A, the debates show the concerns of the drafters and suggest the reasoning behind the text. As noted in our discussion of the *McCarthy* case, we do not dispute that judges in the past may have run for nonjudicial offices of public trust during what we have now defined as the "term for which elected." However, information we have on these cases and other possible "violations" is scant and analysis based on these examples could only be speculation on the part of this court.[19] *McCarthy,* 255 Wis. at 245. Finally, as noted by this court in *McCarthy,* the existence of such conduct in the past makes no difference to the present legal analysis. *Id.* at 245. Simply put, multiple wrongs do not make a right.

---

[19] Indeed, the dissent has put forth examples it asserts violate the provision. *See* dissent, ¶¶ 104–106, 108, 111–114. While there do appear to be some valid examples, we dispute the dissent's assertion that "examples abound." Dissent, ¶ 111. Many of the examples noted by the dissent, including Isaac Walker, George Noyes, and Herman Humphrey, must be discounted because the constitutional provision explicitly does not apply to the judicial offices they held. *See* dissent, ¶¶ 111–114. Article VII, Section 10 of the Constitution, as adopted in 1848, expressly stated that it only applied to "judges of the supreme and circuit courts."

¶ 62. In addition to the debates, contemporaneous statements at the time of the drafting support our interpretation. During the debate over ratification of the constitution following the conclusion of the first constitutional convention, the Racine *Advocate* published a series of letters about the proposed constitution, many of which were anonymous. Quaife, *The Struggle Over Ratification* at 13–66, 208–215, 436–513. One letter, almost certainly written by Edward G. Ryan,[20] explained the provisions of the article on the judiciary, leaving little doubt of the intent regarding the prohibition against judges holding other office. The article stated:

> And finally the prohibition of the judges to hold any other office during their full term of election, *whether they remain on the bench or not,* will forever end the disgraceful practice by which the sacred duties of the bench have been prostituted to the political advancement of the judges.[21]

[20] Quaife, *The Struggle Over Ratification* at 13 n.1; Beitzinger, *Lion of the Law* 177–78 n.14.

[21] In ¶¶ 93–94, the dissent notes that Ryan was nominated by the Wisconsin Senate for the office United States Senator. The dissent suggests that because Ryan was serving as chief justice at the time, he either interpreted the provision at issue here differently than the majority or was willing to violate the constitution. Dissent, ¶ 94. This, however, can only be speculation. Ryan was never elected to the Senate, and never held a nonjudicial office of public trust during his term. 1879 Senate Journal, 65–72; *see also* Beitzinger, *Lion of the Law* 167 (noting that upon his loss, Ryan "hinted in a humorous vein that he had been the victim of a conspiracy on the part of the three Republican candidates. At this the legislators broke into good-natured laughter and applause.").

Quaife, *The Struggle Over Ratification 1846–1847* at 488 (1920) (emphasis added).

¶ 63. Similarly, one of the judges cited as an example by the dissent, actually discussed what the concerns were about the judiciary during the 1846 convention and after, during the ratification debates. His statements support our interpretation that the idea of restricting judges began during the first convention and had support as the debate continued. Isaac P. Walker, in his "Address to the People of Wisconsin," given on March 31, 1847, discussed the benefits of the proposed constitution, particularly the provisions serving to restrain the political ambitions of those on the bench:

> . . . But above all, by our constitution every officer, whether executive, administrative, legislative, or judicial, is expressly rendered ineligible during his term of office "to any other office of trust, profit, or honor in the state.
>
> Now, fellow citizens, under such a system of government what opportunity is left for a corrupt office-seeking or office-holding regency, junto, clique, or dynasty either to concentrate or to combine to trample upon the people's rights and interests? . . . No; they have not only to pass the ordeal of our suffrage, *but the constitution declares that each must have served out his term before he can take another station.* And I have no fears but that he will be required to have served it faithfully before the people will call upon or elevate him again. *Our constitution would present but few charms* to such a politician as the Senator from Illinois, to whom I have alluded; *and quite as few to another new-made Senator in Michigan, who in about two years past has leaped from the ranks of mere ambition to the bench, from the bench to the gubernatorial chair, and from that*

*into the United States Senate, serving the people in neither capacity any longer than to enable himself to get a better office.*[22]

Quaife, *The Struggle Over Ratification,* at 601 (emphasis added). Such written, contemporaneous interpretations lend credence to our interpretation by pointing out the prevalent concerns that prompted the drafters to institute various protections. Walker's statement indicates that even before the actual phrase "during the term for which elected" became part of the constitution at the second convention, there were those who believed it proper to restrain judges during the entire period of time for which the people originally elected them to serve and even beyond.

¶ 64. We note also, in discussing practices at the time the constitution was drafted, that other states were participating in similar debates. In August of 1847, only a few months before the second constitutional convention in Wisconsin, delegates to a convention in Illinois adopted a new constitution that was accepted by the people of Illinois in March 1848. *See Illinois Constitutions* 51 n.1 (Emil J. Verlie, ed.) (1919). Article V, Section 10 of that constitution, dealing with the judiciary, contained a provision extraordinarily similar to that eventually adopted in Wisconsin:

---

[22] We disagree with the dissent's contention that Walker "apparently changed his mind" about these statements in later years of his life. *See* dissent, ¶ 112 n.4. As the dissent acknowledges, Walker was a territorial probate judge. *See* John R. Berryman, *History of the Bench & Bar,* Vol. 2, p.40 (1898). Although it appears he became a United States Senator before his term expired, the prohibition against holding other offices did not apply to probate judges. Wis. Const. art. 7, § 10 (1848).

The judges of the supreme court shall receive a salary of twelve hundred dollars per annum, payable quarterly, and no more. . . . The judges of the supreme and circuit courts shall not be eligible to any other office or public trust of profit in this state, or the United States, during the term for which they are elected, nor for one year thereafter. All votes for either of them for any elective office (except that of judge of the supreme or circuit court,) given by the General Assembly or the people, shall be void.

*Id.* at 73. Thus, it was not unheard of to restrict judges beyond the time they actually served on the bench and, in fact, it appears that Wisconsin's convention delegates were not alone in believing it was necessary to do so.[23]

---

[23] The dissent cites the case of *Ballou v. DuBois,* 23 Ill. 498, [\*547] (1860) to dispute the contention that Illinois interpreted the provisions similarly. Dissent, ¶ 123. We find this case, at best, ambiguous. An Illinois court was called upon to examine the constitutional provision similar to Wisconsin's when the legislature redistricted and essentially left a judge in office with no physical territory in which to serve. *Ballou,* 23 Ill. at 502. The dissent quotes a piece of the court's analysis, but conveniently leaves out an important attached statement. *See* dissent, ¶ 123. The court's whole statement regarding the constitutional provision is interesting, but ambiguous. The court stated:

The tenth section of the same article provides, that "the judges of the Supreme and circuit courts shall not be eligible to any other office or public trust, of profit, in this State, or the United States, during the term for which they are elected, nor for one year thereafter." *If the legislature can legislate a judge out of office the next day after he is elected, he must stand disqualified for any other office, or trust, of profit, for the remainder of the seven years;* while it was the intention of the constitution that he should only be disqualified for one year after he went out of office, unless he voluntarily resigns, or is impeached or addressed out of office.

*Ballou,* 23 Ill. at 502–03 (emphasis added).

## C. Earliest Legislation

¶ 65. The final part of our analysis leads us to seek the earliest interpretation of Article VII, Section 10 by the legislature as manifested in the first law passed following adoption. *Oak Creek,* 232 Wis. 2d 612, ¶ 18. Unfortunately, there was no law passed relative to Section 10 until 1913, over 50 years later, in Wis. Stat. ch. 115, § 2523–22 (1913).[24] However, since Section 10 was amended in 1912, and because, technically, it is the first law passed on this provision, we find it appropriate to look at the 1913 legislation.

¶ 66. Wisconsin Stat. ch. 115, § 2523–22 (1913) provided:

> No judge of any court of record in this state, except judges of county courts, shall be eligible to or hold any office of public trust, except a judicial office, during the term for which he is elected, and all votes cast for any such judge for any office, except a judicial office, shall be void.

This statutory language appears to simply codify the constitutional provision and provides no real guidance regarding correct interpretation. However, it is of note that the drafters of this statute carried over the language of the constitution and left intact the prohibition of holding any office of public trust "during the term for which [] elected." *See id.*

---

[24] The dissent points to the election of two judges to office as earlier legislative acts. Dissent, ¶ 116. As we have stated previously, we do not find such examples persuasive and in fact, as we have noted, one of the examples cited, Judge Isaac Walker, was a probate judge, a position for which the constitutional prohibition did not apply. *See* Berryman, *History of the Bench & Bar,* Vol. 2, at 40.

¶ 67. Although this early legislation does not allow much insight into the intent of the provision, we find it important that, similar to the constitution, the phrase "during the term for which elected" has remained in the statutes through a variety of alterations, during which the text of the provision was scrutinized, and remains in the present statute, Wis. Stat. § 757.02(2).

¶ 68. Because this first law is of so little use, we follow the trail of this statute a bit further in our quest for answers. In 1919, the statute, renumbered as Wis. Stat. § 2564m(2), was amended to read:

> *The* judge of any court of record in this state shall be *ineligible* to hold any office of public trust, except a judicial office, during the term for which he *was* elected, and all votes cast for any such judge for any office, except a judicial office, shall be void.

(Emphasis added for amendments); *see also* § 5, ch. 93, Laws of 1919. One of the revisions, from "is" to "was," shows a focus on the past, on an occurrence that has already happened and is presently immutable. This focus again suggests that the language refers to the full term for which a candidate is originally elected, a set time period, rather than the time until a person chooses to resign.

¶ 69. In 1923, the legislature added penalties to the provisions of Wis. Stat. § 2564m. *See* ch. 134, Laws of 1923. Under Wis. Stat. § 2564m(2)(a) (1923), a judge that decided to run for an office of public trust during the term for which elected, vacated his office when becoming a candidate. Also, nomination papers were not to be accepted. *Id.* Under Wis. Stat. § 2564m(2)(b) (1923), becoming a candidate was a felony offense, punishable with a fine and prison. Under Wis. Stat.

767

§ 2564m(2)(c) (1923), if convicted, a judge would thereafter be ineligible to a variety of offices of public trust, unless granted an executive pardon. However, under that same provision, excepted were those judges whose term would expire prior to the holding of office. *Id.* Although these provisions have long-since been repealed, the language used suggests that the drafters of the constitution and original statute meant what they said with the phrase "during the term for which elected." That phrase is used repeatedly in the 1923 version of the statute. *See* Wis. Stat. § 2564m(2) (1923).

¶ 70. By 1961, the clause stating the votes would be void was eliminated. *See* § 113, ch. 495, Laws of 1961. This might help explain the elimination of the same language in the 1977 constitutional amendment to Article VII, Section 10. In 1977, the statute was again amended. *See* ch. 187, Laws of 1977. We find it of particular import that although the constitutional language was amended the same year, the only revisions to the statute were to renumber it as Wis. Stat. § 757.02(2) (1977) and make it gender neutral. *See id.* Since that time, no substantive changes have been made to the provision.

¶ 71. This statutory history, while not a crystal clear mark of legislative intent, does provide support for a strict interpretation of Article VII, Section 10 in the constitution, particularly in light of plain meaning analysis and the timing and opportunity for change with regard to the statute. In essence, when the legislature reexamined the statute at or near the time of constitutional revision, neither the constitution nor the statutory history provides any indication that the phrase "during the term for which elected" was in-

tended to be anything other than a prohibition to last the entire period for which a judge or justice was originally elected.

IV

¶ 72. We have addressed the petitioner's arguments that Article VII, Section 10 is merely a dual office holding restriction. However, the amicus in this case disagrees both with the State and the petitioner and has presented an alternative interpretation of the "term for which elected" language. The amicus argues, and the dissent agrees, that "during the term for which elected" means the "term" ends when a successor is duly elected. *See* dissent, ¶ 100. We are not persuaded by this argument. While the position may present a "happy medium," we find no basis for this interpretation in the language of the constitution, the debates, or the relevant legislative acts.

¶ 73. This court does not have the freedom to start from scratch or redebate the best solution to the problem of judicial independence. That was the job of the drafters, and if changes are necessary, it will be the job of the legislature and citizens. Rather, we are presented with the duty to interpret the language of the constitution as written by the drafters and ratified by the citizens of this state. We are not persuaded that "the term for which elected" ends simply because a new person has been selected for a judicial position. The concerns debated by the drafters and the text of the constitution belie such an interpretation.

¶ 74. The dissent asserts that the amicus is correct in its argument that the "term for which elected" ends "when a successor is duly elected and qualified."

769

Dissent, ¶ 100. Although such an interpretation would give the provision a meaning, we find that there is simply no basis, textual or otherwise, for drawing the line at the point of a new election. Based on our analysis in Part III, we find that while the word "term" may be interpreted in a variety of ways depending on the context in which it is used, and in the context of "during the term for which elected," a "term" is the fixed period of time set out by the constitution that cannot be altered by resignation. The plain language of the constitution and the numerous interpretations of that language since its adoption support no other alternative. Judges and justices, by accepting roles in the judiciary, accept a restriction on their ability to be candidates for nonjudicial offices of public trust for the entire period of time for which the voters elected them into office. These "terms" are specifically outlined in the constitution. Nothing requires a judge or justice to actually serve the entirety of the term for which he or she is elected, but it cannot be concluded on that basis that a judge or justice is automatically excused from the responsibilities acquired by assuming a role on the bench, even if a successor is elected.

¶ 75. The independence of the judiciary is a bulwark of the democratic system, and promoting such independence may require those taking judicial positions to accept sacrifices even beyond the time they are actually on the bench to preserve the integrity of the system. *See Clements,* 457 U.S. at 968 n.5 ("The State's particular interest in maintaining the integrity of the judicial system could support § 19, even if such a restriction could not survive constitutional scrutiny with regard to any other officeholder."). The election of a new judge or justice does not negate the responsibili-

ties taken on by a prior judge or justice. We agree that a "term" may in one sense end with resignation, but we agree with the State that the "term for which elected" does not. That term is explicitly set by the constitution, and the restriction in Article VII, Section 10 supports voters' expectation that when they elect a judge or justice, he or she will serve the term constitutionally set—the term for which elected.

## V

¶ 76. We turn now to petitioner's final argument, that a prohibition such as Article VII, Section 10 deprives the petitioner of his constitutional rights to liberty and equal protection of the law under both the Wisconsin Constitution and the United States Constitution. The analysis of restrictions on candidates for office often intermingles with an analysis of the effect on the rights of voters. *See Anderson v. Celebrezze,* 460 U.S. 780, 786–87 (1983). These types of cases often raise issues related to the First Amendment, due process, and equal protection under the law. *See id.* The analysis for all these types of cases is essentially the same. *See id.* at 786 n.7 (noting that various types of constitutional claims required the same analysis in the election context). Courts have recognized that the right to run for public office is a constitutionally protected liberty interest. *See, e.g., Becton v. Thomas,* 48 F. Supp.2d 747, 757 (W.D. Tenn. 1999).

¶ 77. In analyzing a constitutional challenge to a state's election law, a court "must first consider the character and magnitude of the asserted injury to the rights protected." *Anderson,* 460 U.S. at 789. Further,

"[i]n passing judgment, the Court must not only determine the legitimacy and strength of each of [the state] interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* As noted by this court in the case of *State v. Hezzie R.*, 219 Wis. 2d 848, 893, 580 N.W.2d 660 (1998): "Equal protection requires that there exist reasonable and practical grounds for the classifications created by the legislature." This court has held that the constitutional guarantees of the Wisconsin Constitution and United States Constitution are substantially equivalent. *See id.* at 891 (finding state and federal due process clauses equivalent); *Treiber v. Knoll,* 135 Wis. 2d 58, 68, 398 N.W.2d 756 (1987) (noting equivalency in equal protection guarantees). Fortunately, the analysis of the Supreme Court in *Clements* has already laid the groundwork for our analysis of the petitioner's liberty and equal protection interests.

¶ 78. While we agree that petitioner's rights are somewhat burdened in this case, we find that the State's legitimate interests in creating Article VII, Section 10 far outweigh the burdens put upon the petitioner's right to be a candidate for office. Petitioner concedes that his liberty and equal protection interests are only violated if there is no reasonable basis for the restriction, but argues that no such rational basis exists for this type of restriction. Following the guidance put forth in *Clements,* we cannot agree. We find there are significant state interests protected by a provision such as Section 10.

██

¶ 79. Under *Clements,* it is clear that no suspect classification or fundamental right is involved in this type of case, so strict scrutiny is not demanded. As the *Clements* court noted: "Far from recognizing candi-

dacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.' " *Id.* at 963 (quoting *Bullock v. Carter,* 405 U.S. 134, 143 (1972)). That court went on to define the appropriate standards for examining a case such as this:

> Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions.

*Id.* (internal citations omitted). Wisconsin case law also supports our finding that the petitioner has no fundamental right to be a candidate. In *Frederick v. Zimmerman,* 254 Wis. 600, 617, 37 N.W.2d 473 (1949), this court held that although "the right to vote is an inherent or constitutional right, the right to be a candidate is not of that character." We must concede, based on Supreme Court precedent, that there is a recognized right in candidacy. However, *Frederick* and the Supreme Court precedent agree that the right is clearly something less than fundamental. In *Anderson,* 460 U.S. at 788, the United States Supreme Court held that a "State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." In *Becton,* 48 F. Supp.2d at 758, a district court found that the liberty interest in running for public office could not be denied or infringed "unless [the state] can offer a reasonable justification or rational basis for doing so."

¶ 80. In *Clements,* 457 U.S. 960, the United States Supreme Court dealt with Texas provisions very much like the one we interpret today.[25] The Supreme Court there interpreted two provisions of the Texas Constitution. One provision was essentially a resign-to-run clause. *See Clements,* 457 U.S. at 960. The other, Article III, Section 19 of the Texas Constitution, was a provision much like Article VII, Section 10 of the Wisconsin Constitution. That section provided that "judges of any court" were not eligible to the legislature "during the term for which he is elected or appointed." *Id.* Regarding Section 19, the Supreme Court found:

> Resignation is ineffective to avoid § 19 if the officeholder's current term of office overlaps the term of the legislature to which he seeks election. In other words, § 19 requires an officeholder to complete his current term of office before he may be eligible to serve in the legislature.

*Id.*

¶ 81. In upholding the Texas restrictions, the Court identified several important state interests: 1) the state has an interest in encouraging judges to devote full time to the duties of their office instead of

---

[25] We note that since the United States Supreme Court decided *Clements v. Fashing,* 457 U.S. 957 (1982), the Texas Supreme Court has had the opportunity to again review the language of one of the provisions at issue in *Clements,* namely Article III, Section 19 of the Texas Constitution. *See Wentworth v. Meyer,* 839 S.W.2d 766 (Tex. 1992). The Texas Supreme Court in *Wentworth* found Section 19 should be construed strictly against ineligibility and overruled its previous interpretations of the provision to hold that Section 19 only applied during the officerholder's actual time of service. *See id.* at 767–68. We do not find that court's analysis persuasive and we maintain that the *Clements* analysis is proper.

spending time on a campaign for a different office; 2) there is a legitimate state interest in discouraging judges from vacating their offices early to avoid the difficulties accompanying interim appointments and elections; and 3) the state has a strong interest in insuring that sitting judges will not abuse their present power because of aspirations for higher office. *Id.* at 968. All of these apply with equal force to Article VII, Section 10 of the Wisconsin Constitution.

¶ 82. Similar to those rationale put forth in *Clements* are those put forth by the State in this case. The State asserts here:

> It is reasonable to believe, moreover, that judges who seek a different office earlier in their term are more likely than judges who serve their entire term to view judicial office as a mere stepping stone to political office, and are therefore more likely to misuse their judicial office for the purpose of advancing their own career.

(Resp't Br. at 25.) We agree with the perspective that preventing judges from holding another office of public trust until their term expires, whether or not they resign, helps discourage people from taking positions on the bench to use as "mere stepping stone[s]" to political office. As the Supreme Court noted, such "waiting periods" are not substantial burdens in comparison to the state interests. *Clements,* 457 U.S. at 968.

¶ 83. In a somewhat similar case to that faced here,[26] the West Virginia Supreme Court of Appeals eloquently stated the strong state interest in creating restrictions upon those serving in the judiciary:

[26] In *Carenbauer v. Hechler,* 542 S.E.2d 405 (W.Va. 2000), the West Virginia Supreme Court of Appeals interpreted Article VII, Section 7 of its constitution, a resign-to-run restriction on justices, judges and magistrates. In the case, an incumbent

775

> Concomitant to the sustained confidence of the public in the judiciary is the correlative responsibility that integrity must be the cynosure of all judicial endeavors, both actual and perceived. So crucial is the state's interest in maintaining the integrity of its judicial system that regulations or restrictions which temporally affect an officeholder's access to the ballot have been found to withstand constitutional challenge on this ground alone.

*Carenbauer v. Hechler,* 542 S.E.2d 405, 409 (W.Va. 2000). These considerations and those noted by the United States Supreme Court far outweigh any burden laid upon the petitioner to wait to become a candidate for a nonjudicial office of public trust. Even though the restriction does not end with the resignation of a judge or justice, it was concern for the integrity of the judiciary as a whole and desire to promote that integrity from sitting members of the bench that appropriately led to the creation of this type of restriction. These state interests are of the utmost importance. As noted in *Carenbauer,* 542 S.E.2d at 410: "Undergirding the constitutional prohibition against seeking nonjudicial elective office is the correlative objective of both removing and insulating judges from the political realm." Given all of these significant state interests, we conclude that the petitioner's rights to liberty and equal protection of the law have not been violated by Article VII, Section 10 of the Wisconsin Constitution.

¶ 84. By no means do we exalt the provision discussed in this case as the solution to all evils related to the judiciary or the best support for judicial independence. The reality is that this provision appears to us to

---

supreme court justice filed a certificate of candidacy for another seat on the same court while still serving his unexpired term. *Id.* at 408.

776

fall short of optimum in more than one respect. However, it is not the job of this court to assess the wisdom of any given provision; rather, we ascertain what the law is and whether it may be applied when balanced against the constitutional protections guaranteed to citizens of this state and of this country. Moreover, the provision as it stands need not be the best option. The State's interests here are important and the purposes behind this law have long been served by the language of this provision.

## VI

¶ 85. We therefore conclude that Article VII, Section 10(1) of the Wisconsin Constitution prohibits a circuit court judge or any judge or justice of a court of record in this state from holding a nonjudicial position of public trust during the entire term for which elected, regardless of whether he or she chooses to resign from the judicial position.

*By the Court.*—It is declared and adjudged that Article VII, Section 10 of the Wisconsin Constitution prohibits petitioner, a circuit judge, from holding a nonjudicial office of public trust during the full period of time for which he was originally elected and that, as such, petitioner is ineligible to run for Milwaukee County Executive or any other nonjudicial office of public trust until his term expires in August 2006.

Relief denied.

¶ 86. DIANE S. SYKES, J., did not participate.

¶ 87. ANN WALSH BRADLEY, J. *(dissenting).* I agree with the majority that our task is to discern the meaning of the phrase "during the term for which elected" as intended by the drafters of the 1848 consti-

tutional convention. I acknowledge the tried and true analytical framework employed by the majority when determining the meaning of a constitutional provision: examine the words of the text, the constitutional debates, the practices at the time, and the earliest interpretations manifested by the legislature. Majority op., ¶ 18.

¶ 88. I part ways with the majority, however, because its interpretation is unsupported by the 1848 convention debates and is inconsistent with the early practices and legislative acts. Rather, after stripping away the irrelevant discussion of the majority, and employing the accepted analytical framework, I conclude that the "term for which elected" ends after a successor is duly elected and qualified.

¶ 89. First, let us discard some of what is irrelevant. Much of the discussion in both the plain meaning section and the constitutional debates section of the majority's opinion is irrelevant because it cites debates focusing on the wrong issue, from the wrong constitutional convention, to interpret a phrase that was not adopted at that convention, by delegates who were not elected to the subsequent and more relevant 1848 convention.

¶ 90. As the majority correctly notes, one of the issues of great debate at the first convention in 1846 focused on whether the constitution should provide for an elected or appointed judiciary. The eloquent orations of Charles Baker and Edward Ryan cited by the majority argue the pros and cons of an elected judiciary. Yet, the discussion from the first convention on this issue is largely unpersuasive because the issue of an elected judiciary had essentially been put to rest by the time of the second convention. It was recognized that the popular will demanded election and no serious argu-

778

ment against it was made at the second convention. Ray A. Brown, *The Making of the Wisconsin Constitution,* 1952 Wis. L. Rev. 23, 37.

¶ 91. Indeed, although the majority quotes liberally from Edward Ryan, it seems to be misguided about the influence that he had on the judiciary article at either convention. As the majority notes, Ryan never served on the all-important judiciary committee of the first convention. Most of his commentary on the article on the judiciary dealt with his determined opposition to the election of judges. *See* Milo M. Quaife, *The Convention of 1846,* 590–603. The 1846 convention ultimately presented for ratification a constitutional provision on the selection of judges that was at odds with the position espoused by Ryan. He was not a delegate to the second convention, and there is little to show that he had any influence on the relevant discussion, the meaning of the phrase "during the term for which they are respectively elected."[1]

¶ 92. It is curious that the majority relies so heavily on statements made by Edward Ryan at the first constitutional convention as support for its interpretation. Perhaps it does not realize that these statements were made in a speech promoting the merits of an appointed judiciary, a position which was defeated in both constitutional conventions. More pointedly, it is difficult to understand why the majority so heavily

---

[1] The majority observes that Ryan recommended similar language during the debate over the 1846 constitution. Majority op., ¶ 27. It fails to note, however, that Ryan's proposal was for a judiciary appointed by the governor.

The word "respectively" was removed as part of the revisions to this section made in 1977. *See* 1975 Enrolled Joint Resolution 13; 1977 Enrolled Joint Resolution 7.

relies on Ryan because he did not interpret the phrase at issue as the majority does today.

¶ 93. In April 1875, Ryan was elected chief justice of the supreme court to fill the unexpired term of Chief Justice Luther Dixon, who had resigned. If he had lived, Ryan's term would have expired on the first Monday of January 1882. John R. Berryman, *History of the Bench and Bar,* Vol. 1, p. 180–81 (1898). On January 22, 1879, while Ryan was serving as chief justice of the Wisconsin Supreme Court, the Wisconsin legislature met in joint session to elect a United States Senator. Ryan was one of the three nominees for the position.

¶ 94. In a hotly contested election, Ryan finished second.[2] 1879 Senate Journal, pp. 96–101. If he had been elected senator, he would have had to resign his position on the court in the middle of his term. By his actions, we must conclude that either Chief Justice Ryan intentionally and publicly violated the constitutional prohibition, or that he did not interpret the prohibition as does the majority today. I conclude the latter. His actions reflect an interpretation of the phrase in issue that is decidedly at odds with that advanced by the majority.

---

[2] Both the Assembly and Senate voted for nominees for United States Senate. They met first separately and then met in a joint session. In the initial vote in the Senate, Ryan finished second out of four candidates. He fared better in the Assembly, finishing first out of five candidates. However, when the Senate and Assembly voted in joint session, Ryan ultimately lost the election.

The majority attempts to minimize Ryan's nomination by noting that he was not elected. The fact remains, however, that his name was placed in nomination for an office of public trust while he was serving as chief justice of the supreme court.

¶ 95. Although the acceptance of an elected judiciary, which Ryan opposed, was well settled by the time of the second constitutional convention, other issues in the judiciary article remained in dispute. The remarks of Byron Kilbourn at the opening of the second constitutional convention indicate that the judiciary article, along with a handful of other articles, would be the most prominent at the new convention.

> It was the province of this body to study out and avoid those measures known to be repugnant to the popular will, and although there might be some little difference of opinion as to what those articles were and precisely to what effect they had been condemned, yet he apprehended that all would agree that the judiciary article, the bank article, and the articles on exemption and the rights of married women were most prominent and had met with most disapprobation.

Milo M. Quaife, *The Attainment of Statehood,* 179 (1928).

¶ 96. The phrase at issue, which was introduced at the second constitutional convention, was not a part of the initial Article VII, Section 10 draft submitted to the 1848 convention by the Committee on the Judiciary. It first appeared before the convention on the afternoon of January 21, 1848. The Committee on the Judiciary reported Article VII back to the convention with "sundry amendments." Quaife, *The Attainment of Statehood,* at 691. Among the amendments advanced by the Committee on the Judiciary was a fifth amendment which added the phrase "during the term for which they are respectively elected." *Id.* at 696. Apparently the creation and discussion of this phrase took place in committee. No discussion is reflected in the written accounts of the convention. *Id.*

781

¶ 97. In addition to the largely unpersuasive discussions of the majority noted above, the opinion is replete with irrelevant, albeit interesting, discussion. The legislative history concerning the 1977 court reform (majority op., ¶¶ 34, 35) and the defeated 1995 referendum (majority op., ¶¶ 31–33, 36–39) offers current views of what the phrase provides or what it should provide. Such discussion sheds no light on the essential inquiry before us: what did the drafters of the 1848 constitution mean by the phrase "during the term for which they are respectively elected."

¶ 98. Likewise discussion concerning the adoption in 1967 of the Code of Judicial Ethics, and cases cited concerning enforcement actions brought under the Code, miss the mark of our essential inquiry. *See* Majority op., ¶¶ 45–47. Similarly, since the attorney general opinions cited are not interpreting the Wisconsin constitution, but are offered to interpret subsequent statutory provisions, they are of little assistance. *See* Majority op., ¶¶ 48–49.

¶ 99. The majority and I differ as to the length to which the prohibition is extended. The majority would extend the period of prohibition as though the judge had remained on the bench and not resigned.

¶ 100. I believe such an interpretation is not supported by the constitutional debates and is inconsistent both with the practices at the time and the early legislative acts. Rather, the more reasonable interpretation is that the prohibition ends when the term ends: when a successor is duly elected and qualified.

¶ 101. Unlike the majority, I focus not on Edward Ryan as providing the key to understanding the meaning of the phrase in question, but on Charles Dunn. Morgan Martin, president of the second constitutional convention, described Dunn as the strongest man intel-

lectually in the second constitutional convention. Quaife, *The Attainment of Statehood,* at 911. When Wisconsin became a territory in 1836, President Andrew Jackson appointed Dunn chief justice of the new court. He served as the chief justice during the entire territorial period. *See also,* John Bradley Winslow, *Story of a Great Court,* 33–36 (1912).

¶ 102. Of greater significance for our discussion, Dunn also served as chair of the five-member Committee on the Judiciary of the second constitutional convention. Quaife, *The Attainment of Statehood,* at 912. Serving as chair of the judiciary committee, he was considered very influential in preparing the judiciary article of the constitution. *Id.* As noted above, the wording of the phrase in question came from his committee and passed the constitutional convention without discussion by the convention as a whole. Since no record exists of the committee discussion, I look to his actions and the practices of the time for illumination of how the drafters interpreted the phrase "during the term for which they are respectively elected."

¶ 103. The majority builds a house of cards premised on the foundation that the drafters, out of a heightened concern for preserving judicial independence, intended that the prohibition at issue be interpreted to last the entire period for which the judge or justice was originally elected. Majority op., ¶¶ 28, 63. As with an examination of the life of Chief Justice Ryan, the house of cards collapses when we examine how Dunn and the early legislature approached this limitation.

¶ 104. After the second constitutional convention, Dunn was elected to the state senate and served as the chair of its Judiciary Committee. In 1857 he was a candidate for the United States Senate, which was a

position elected by the state legislature. His main opponent, and the ultimate victor, was none other than James R. Doolittle, a former circuit court judge. Doolittle had been elected judge of the first circuit in 1853, taking office on January 1, 1854, for a term of six years. He resigned two years later, in March of 1856, and within a month John Keep was elected to fill the judgeship. Berryman, *History of the Bench and Bar,* Vol. 1, p. 352.

¶ 105. In addition to Dunn, five members of the legislature in 1857 were also members of the second constitutional convention. *Laws of 1857,* pp. 3–6.[3] All participated in this election of a former circuit court judge, who resigned mid-term and accepted a position of trust, the United States Senate. But the election of Doolittle was not accomplished until his successor had already been duly elected and qualified.

¶ 106. Certainly, if such an election violated a judicial provision of the new constitution, a provision which he advanced as chair of the convention's judiciary committee, Dunn would have insisted that the votes cast for Doolittle, his opponent and the victor, should be voided. Surely if such an election violated the constitution which the five legislators/convention delegates had so recently drafted, they would not have condoned such a violation.

¶ 107. The majority's interpretation requires us to believe that Charles Dunn would silently acquiesce in allowing his opponent to unconstitutionally declare

---

[3] Members of the 1857 legislature who were also members of the second constitutional convention were: James Fagen from Cedarburg; Ezra Albert Foot from Footville; Louis Powell Harvey from Shopiere; Frederick S. Lovell from Kenosha (he was also chair of the Assembly Judiciary Committee in 1857); and James Denoon Reymert from Milwaukee.

victory. It requires us to believe that the five former delegates quietly participated in an unconstitutional election. Instead, I believe that neither Dunn nor the 1857 legislature interpreted the phrase as does the majority.

¶ 108. Likewise, Charles Larrabee, a circuit court judge and early supreme court justice who served as a delegate to the second constitutional convention, did not interpret the phrase as does the majority. He resigned mid-term in 1858 to serve as a member of congress. Winslow, *Story of a Great Court,* p. 18.

¶ 109. Admittedly these positions of trust are federal positions. The constitutional provision at issue, however, makes no distinction between federal and state positions of trust. As the court noted in *State v. McCarthy,* 255 Wis. 234, 38 N.W.2d 679 (1949), the "clear" language of Article VII, Section 10 would have also applied to federal positions of trust: "It may have been argued that sec. 10, art. VII, Const. applied only to state offices of public trust. The subsequent language of the section that all votes cast for circuit judges by the legislature or the people makes perfectly clear that the office of United States senator was included." *McCarthy,* 255 Wis. at 248.

¶ 110. A review of the practices of the time reveal that the rationale espoused by the majority for extending the period of prohibition also lacks support. The majority asserts that a heightened concern for the "evils" attendant to an elected judiciary led the second constitutional convention to extend the period of prohibition not just until the incumbent resigned, or not just until a successor was duly elected and qualified, but for the entire length of the original term elected. Majority op., ¶ 28. The practices of the day do not reflect this heightened concern.

¶ 111. Examples abound in the early days of statehood of judges who resigned mid-term to accept positions of trust. Many of these were not justices or circuit court judges, but their practices illustrate that the heightened concern necessitating a prolonged period of prohibition simply did not exist.

¶ 112. Isaac Walker, the first probate judge from Milwaukee, resigned mid-term in 1848 after being selected by the legislature to serve as a U.S. Senator. The selection of this judge to a position of trust after his mid-term resignation represents one of the earliest acts of the newly created Wisconsin legislature. The legislature first convened on June 5, 1848, and three days later, on June 8, 1848, it selected Walker as one of the two initial senators from Wisconsin. 1848 Senate Journal, pp. 1, 17.[4]

¶ 113. George Noyes, the first superior court judge in Milwaukee, resigned in March of 1890 after serving only two years of a six-year term. He was well acquainted with the early leaders of the bench and bar, having been a law partner with the former chief justice

---

[4] I am perplexed by the majority's lengthy quote and discussion of Isaac Walker, a delegate of the first constitutional convention. Majority op., ¶ 63. The quote is offered by the majority as a contemporaneous statement decrying the kind of ambition which would cause a jurist to leap from the bench to a higher office of trust. Walker is quoted as complaining about men who ". . . leaped from the ranks of mere ambition to the bench . . . into the United States Senate."

What the majority fails to note or connect is that Walker himself later became an example of the very thing he earlier decried. In "leaping" from the position of probate judge to the United States Senate, Walker apparently changed his mind about the wisdom set forth in the quote which the majority now embraces.

of the Wisconsin supreme court, Luther Dixon. Shortly after his resignation Governor Hoard appointed Noyes to a position of trust as a regent of the state university of Wisconsin. Berryman, *History of the Bench and Bar*, Vol. 2, p. 51–53.

¶ 114. Other examples include Herman Humphrey, a county judge, who resigned in February 1862, to become a member of the state legislature, after serving only one year of his judicial term (Berryman, *History of the Bench and Bar*, Vol. 2, p. 300); and A. P. Hodges, a Winnebago county judge, who resigned in December 1861 to occupy a position of trust, the state prison commissioner, which at that time was an elected position. Berryman, *History of the Bench and Bar*, Vol. 2, pp. 76–77.

¶ 115. Thus, not only do the practices of the day undermine the interpretation advanced by the majority, but also the early acts of the legislature evince a contrary interpretation. The majority advances that the earliest legislative interpretation of Article VII, Section 10 did not occur until over 50 years after its ratification when in 1913 the constitutional language was codified in Wis. Stat. Ch. 115, § 2523–22. (Majority op., ¶ 65). It acknowledges that the codification of the constitutional language "provides no real guidance regarding correct interpretation." *Id.* at ¶ 66.

¶ 116. The majority has overlooked the earliest legislative acts shedding light on the interpretation of this phrase. As noted above, as one of its first acts the legislature selected Judge Isaac Walker to a position of trust in the middle of his judicial term. Such an act by the legislature undermines the rationale which is central to the majority's interpretation of the phrase. Additionally, the election of former Judge James

Doolittle to the United States Senate represents an early legislative act that is completely at odds with the majority's interpretation.

¶ 117. In buttressing its interpretation, the majority discusses at length the case of *State v. McCarthy,* 255 Wis. 234, 38 N.W.2d 679 (1949). The question before the court in that case was whether to impose judicial discipline against a judge who ran for the United States Senate while still serving in his capacity as a circuit court judge. In its per curiam decision, the court mistakenly attributed to an earlier McCarthy case, *State ex rel. Wettengel v. Zimmerman,* 249 Wis. 237, 24 N.W.2d 504 (1946), an interpretation to Article VII, Section 10, which the *Zimmerman* court did not make.

¶ 118. The *Zimmerman* court had no need to analyze and interpret Article VII, Section 10 because it based its holding on the premise that a state could not prescribe qualifications for the United States Senate in addition to those prescribed the constitution of the United States. *Zimmerman,* 249 Wis. at 247. The petitioner argued that Article VII, Section 10 precluded McCarthy from seeking the nomination by the Republican party for the office of senator of the United States. Without addressing whether the language of Article VII, Section 10 precluded such a candidacy, the court held that even "if the argument of the [petitioner] is sound," the state does not have the authority to prescribe the qualifications for United States senator "in addition to those prescribed by the United States Constitution." *Id.*

¶ 119. In a further attempt to support its interpretation, the majority cites to the constitutions of Minnesota, Majority op., ¶ 51, and Illinois, Majority op., ¶ 64. In *State ex rel. Childs v. Sutton,* 65 N.W. 262 (Minn. 1895), the Minnesota Supreme Court inter-

788

preted a provision in the Minnesota Constitution prohibiting senators and representatives from holding any office "during the time for which he is elected." However, the constitutional provision prohibiting judges from holding another office does not contain a similar phrase.

¶ 120. Article 6, § 11 provides: "[t]he justices of the supreme court . . . shall hold no other office under the United States nor any other office under this state." Thus, the majority opinion correctly details the Minnesota court's analysis as it relates to senators and representatives, but the language relating to the judiciary is different in the Minnesota constitution, and different from the language in our constitution.

¶ 121. The majority advances that the purpose for including the phrase in the Wisconsin constitution is to preserve the independence of the elected judiciary. It is unclear how that stated purpose applies to Minnesota legislators given that there is no similar phrase in the judiciary article of the Minnesota constitution.

¶ 122. In 1950, Minnesota Supreme Court Justice Harry H. Peterson resigned his seat on the court and immediately became a candidate for governor. *See, Dougherty v. Holm,* 44 N.W.2d 83 (Minn. 1950). In a case involving the election, the Minnesota Supreme Court noted that Peterson could not ethically have announced his candidacy *while he occupied the bench. Id.* at 86. Nothing in the court's opinion suggests that he was constitutionally prohibited from resigning and then seeking the position of governor. Contrary to the majority's suggestion, neither the Minnesota constitutional provision on the judiciary nor the practice in Minnesota supports the majority's interpretation.

¶ 123. Likewise, the earliest Illinois case interpreting the cited constitutional provision falls short of

supporting the majority's claim. The court in *Ballou v. DuBois,* 23 Ill. 547 (1860) interpreted article 5, section 10 of the Illinois Constitution which provides: "the judges of the Supreme and circuit courts shall not be eligible to any other office or public trust, of profit, in this State, or the United States, during the term for which they are elected, nor for one year thereafter." However, it appears as though the *Ballou* court did not interpret this provision to apply when a judge voluntarily resigns: "it was the intention of the constitution that he should only be disqualified for one year after he went out of office, unless he voluntarily resigns, or is impeached or addressed out of office." *Id.*

¶ 124. I look instead to how a relatively early Wisconsin case, *State ex rel. Johnson v. Nye,* 148 Wis. 659, 668, 135 N.W. 126 (1912), interpreted the same phrase "during the term for which he was elected" as it appears in Article IV, Section 12 of the Wisconsin Constitution. Article IV, Section 12 provides:

> No member of the legislature shall, *during the term for which he was elected,* be appointed or elected to any civil office in the state, which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected.

¶ 125. Although the court in that case dismissed the complaint concluding that it failed to state a cause of action because no emoluments of office were increased during the relevant period, it gave a cautionary instruction: "The constitutional provision under consideration should be narrowly construed in favor of eligibility." *Johnson,* 148 Wis. at 668. Although acknowledging the *Johnson* court directive that the provision interpreting the same phrase for legislators should be narrowly construed in favor of eligibility, the

790

majority fails to explain why such a directive does not apply to the same language set forth for the judiciary in Article VII, Section 10.

¶ 126. I would apply the *Johnson* directive and interpret the same language in Article VII, Section 10 in favor of eligibility, limiting the majority's extended period of prohibition after resignation. The majority's interpretation is simply incorrect. It is not supported by the constitutional debates and is inconsistent with the practices at the time and the early legislative acts. In addition, it does not make good sense.

¶ 127. The majority's interpretation is premised on the belief that Article VII, Section 10 allows two people who are elected to have the same judicial term for the same judicial position at the same time. It mistakenly defines the length of all judicial terms as though the judges had remained on the bench.

¶ 128. Here, the essential question before us is: when does the judicial term end when the judge resigns? The question of course is important because it is instructive as to how long the period of prohibition extends.

¶ 129. I conclude that the period of prohibition after resignation extends until the successor is duly elected and qualified. This interpretation is consistent with the practices of the times and the earliest legislative acts, and finds support in Article VII, Section 9 of the Wisconsin Constitution. Article VII, Section 9 provides:

> When a vacancy occurs in the office of justice of the supreme court or judge of any court of record, the vacancy shall be filled by appointment by the governor, which shall continue *until a successor is elected and qualified*. There shall be no election for a justice or

791

judge at the partisan general election for state or county officers, nor within 30 days either before or after such election.

Wis. Const. art. VII, § 9 (2001–02) (emphasis added). The interpretation is also supported by Wis. Stat. § 17.19:

Vacancies in elective state offices shall be filled as follows: . . . (2) JUDICIAL. In the office of justice of the supreme court, court of appeals judge or circuit judge, by temporary appointment by the governor, *which shall continue until a successor is elected, as provided in s. 8.50(4)(f), and qualifies. When so elected the successor shall hold office for a full term* and shall take office on August 1 succeeding the election.

Wis. Stat. § 17.19 (2001–02) (emphasis added).

¶ 130. Thus when a successor is duly elected and qualified, the successor commences an entirely new term on August 1 for a full six or ten years. When the new full term commences, the predecessor's judicial term ends.

¶ 131. In sum, the majority interprets the constitutional provision as barring a former judge from holding another office until the judicial term to which the judge was previously elected would have expired if the judge had remained on the bench. Such an extended prohibition is not supported by the 1848 constitutional debates and is inconsistent with the practices of the times and the earliest legislative acts. Instead, for the reasons set forth above, I interpret the period of prohibition to extend until a successor is duly elected and qualified. Accordingly, I respectfully dissent.

¶ 132. I am authorized to state that CHIEF JUS-
TICE SHIRLEY S. ABRAHAMSON joins this dissent.